## CHICAGO v. TILLEY.

A party to a contract, who has performed part of it according to its terms, and is prevented from completing it by the failure of the other party, is entitled to compensation for the work performed.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. William C. Goudy*, for the plaintiff in error.
*Mr. Melville W. Fuller*, contra.

MR. JUSTICE WOODS delivered the opinion of the court.

On Aug. 28, 1872, the City of Chicago entered into a contract with the County of Cook, of which it was the county seat, for the joint occupancy of block No. 39, in the city, known as the court-house square, whereby, among other things, it was agreed as follows : —

"The said parties shall join in the erection of a public building on said block 39, for the use of the county and city governments respectively, and the courts of record of said county.

"The general exterior design of said building shall be of a uniform character and appearance, as may hereafter be agreed upon by the board of county commissioners and the common council of the city of Chicago.

"That portion of said building situate west of the north and south centre line of said block shall be erected by the city of Chicago at its own expense."

In June, 1875, the county, being ready to proceed with its portion of the building, appointed James J. Egan as its architect, who entered upon the preparation of plans and the construction of the foundation for the county's portion of the building.

On Aug. 9, 1875, the city council passed an ordinance which repealed all former ordinances, orders, and resolutions of the council, pertaining to the erection and construction of the city's portion of the new city hall and court-house, and rescinded all former action in relation to the appointment of architects, and

expressly provided that "nothing in this ordinance shall be construed as to in any manner affect, or in any wise rescind, impair, or amend any contract or other agreement now subsisting between the city of Chicago and the county of Cook."

On the same day the council passed an order, the material portion of which is as follows : —

"*Ordered*, that one architect shall be appointed, whose duty it shall be to prepare the necessary plans and specifications for the erection of the city's portion of a new city hall and court-house, upon block 39, in the original town of Chicago, commonly known as the court-house square, and the general exterior design of the same to be of a uniform character and appearance, as shall be agreed upon by said architect and board of public works and said county commissioners, said architect, when the plans and specifications shall have been prepared by him, and agreed upon by said board, to take charge of and superintend the construction of said building to its completion under the direction and control of said board of public works, and said architect shall also do and perform every other service or thing necessary to be done, in and about the construction and erection of the city's portion of said building to completion, which shall be required to be done and performed by him as such architect, by said board of public works, and said architect shall receive from the city of Chicago as his full compensation for his entire services as such architect the sum of $37,500, said sum being three per cent of the sum of $1,250,000, which shall be the entire cost of the city's portion of said building; and such compensation shall be in full for all services of such architect, and no other or further compensation whatever shall be paid to him by said city."

The order further provided that, whenever the plans and specifications should be agreed upon in manner aforesaid, the board of public works should proceed with the city's portion of said building.

After the passage of this order the city council proceeded to elect an architect to act under its provisions, and Tilley the defendant in error was chosen.

On August 24 he was officially notified of his election, and on the same day made known to the officers of the city his acceptance of the office, and offered to enter into a written contract

and give bonds; but they were not deemed necessary by the city authorities, and were dispensed with.

Soon after the acceptance of employment by him as architect, under the order of August 9, he proceeded to prepare plans for the city's portion of the building.

He made plans for the several floors or stories of the buildings, consulted with the heads of the various departments of the city government as to the accommodations their departments would respectively need, and from the information thus obtained made interior plans for the proposed building, and he also prepared designs and plans for the exterior of the building; these plans or designs were exhibited to the members of the board of public works and to the city officers, from time to time, during the months of September, October, and a part of November, 1875.

The board of public works proceeded to advertise for bids for excavations for the foundations, and the plaintiff prepared the plans and specifications for such excavations, and also prepared plans and specifications for the foundations and subbasement of the proposed building.

Early in November it was ascertained that the plans prepared by Tilley did not harmonize with the plans which had been prepared by Egan, the architect of the county, and pursuant to a resolution of the common council, passed November 15, a joint meeting of the mayor, the city board of public works, the building committee of the common council, the president of the board of county commissioners, and the building committee of the county board, was held to consult in regard to some feasible plan by which the difference arising between the city and county architects might be satisfactorily settled. This joint meeting was held, and was attended not only by the city and county officials mentioned, but also by the plaintiff as architect of the city, and Egan as architect for the county. They had their respective plans there, and explained them to the officials in attendance. The result of this meeting for consultation and examination of plans was a direction by the joint meeting to the architects to prepare a joint compromise plan for the exterior of the building.

The joint meeting adjourned to a future day, for the purpose

of giving the architects time to prepare their new plan or plans. On the day to which the adjournment was taken the joint meeting reassembled, and Egan presented sketches of a compromise plan, embodying substantially the features upon which the building is now being constructed; but Tilley presented no plan, and did not concur in or indorse Egan s plan.

After an examination and discussion of Egan's compromise plan, the proof tends to show that it was adopted by the joint meeting, and the county authorities proceeded to act upon that plan as the one which had been agreed upon and settled by them and the city authorities. After the last joint meeting the proof tends to show that Tilley proceeded to prepare "compromise plans," which, after a time, he exhibited in the ante-room of the council-chamber, and also to members of the board of public works at the office of the board.

On Jan. 13, 1876, at a special meeting of the council called for the purpose of considering matters pertaining to the city hall and court-house, a resolution was passed by the council which, in effect, directed the board of public works to adopt Tilley's compromise plans.

After this meeting of the common council he proceeded to complete his compromise plans, including floor plans for each story, specifications for foundations and sub-basements, and plans for exterior elevation, so that early in the spring of 1876 his plans were so far advanced that he could have proceeded with the construction of the building, and could have had the tracings and working drawings ready as soon as needed for the progress of the work. He was ready at all times to proceed with the construction of the building, but was not allowed to do so.

In the fall of 1876 and spring of 1877, when the city council determined to proceed with the construction of the building, he offered his services as architect, but they were refused; that is to say, he offered to proceed and perform his part of the contract by supervising the erection of the building when the city was ready to proceed with its construction.

On Aug. 27, 1878, he brought this suit. He declared on the special contract contained in the order passed by the city

council on Aug. 9, 1875, and claimed the contract price for his services, namely, $37,500. His declaration also contained the common counts for work and labor, goods sold, money lent, &c.

The following is a copy of the account appended to the declaration: —

"THE CITY OF CHICAGO to THOMAS TILLEY, *Dr.*

"For services as architect in preparing plans for the
   new city hall . . . . . . . . . . . . . $25,000 00
 " services as architect in preparing a second set
   of plans with specifications and diagrams for
   the new city hall . . . . . . . . . . . . 42,500 00
 " services as architect in superintending the build-
   ing of the new city hall . . . . . . . . . 42,500 00
             $110,000 00 "

The City of Chicago pleaded the general issue.

The evidence introduced on the trial of the cause tended to establish the facts above recited.

Thereupon the court, among other things, charged the jury as follows: —

"There is no provision in the contract, or in any subsequent dealings or relations between the parties, that shows how this sum of $37,500, the compensation that Tilley was to receive for his services, was to be paid, but I think the fair presumption is, inasmuch as it was expected that the erection of this work would extend to a long term of years, perhaps, that the plaintiff was not to wait until the entire completion of the work before he received some compensation, and that he was to be paid from time to time upon some basis to be established, so that when the work was done he should not have received more than the aggregate amount of his compensation.

"Tilley was employed like any other employé of the city, to do a certain thing. It was, as far as practicable, to contribute his professional skill, and the suggestion of plans which might or might not be adopted.

"It may then be considered as undisputed that Tilley was employed to prepare plans and specifications, and did some

work in the line of his employment, and for this he is entitled to compensation, as far as possible, at the rate for which he was to do the whole work under the contract; that is to say, he had agreed to prepare plans and specifications and superintend the entire construction of the building for $37,500.· He did a part of that work. He did something in the line of his duty; and if it is possible to ascertain from the proof and contract how much his compensation should be for the work, in the ratio of the entire compensation, the jury should arrive at that."

The City of Chicago excepted to these charges. There were other charges excepted to, but these present all the questions which are raised by the assignments of error.

The jury returned a verdict for Tilley for $13,000, on which the court rendered judgment. This writ of error was brought by the city to reverse that judgment.

The assignments of error all refer substantially to the construction put by the court upon the contract between the plaintiff in error and the defendant in error. If the contract was rightly construed by the court, then all its charges to the jury were correct and the plaintiff in error has no ground of complaint.

The question at what time the defendant in error was to receive his compensation had become entirely immaterial. If he was entitled to recover at all, he could, at the time the suit was brought, lawfully claim all the compensation that was owing to him. The point which the plaintiff in error makes is that he was entitled to nothing. Its argument is that the contract was an entire one, and that he was entitled to no compensation until he had fully completed and performed it; and not having done this, was entitled to nothing.

The evidence submitted to the jury tended to show, and the jury must have found, that the defendant in error, when the city council decided in the fall of 1876 to go on with the construction of the building, offered to proceed and perform his part of the contract, and that his services were refused.

The question is thus raised whether, up to that time, he had done what the contract required him to do. It is clear from the record that he never did procure the concurrence of the

board of county commissioners in his designs for the exterior of the building.

The city claimed that his contract was not only to prepare the necessary plans and specifications for the erection of the city's portion of the new city hall, but to obtain the approval and adoption of his plans by the board of county commissioners. In our opinion this was not the meaning of the contract.

The agreement between the city and county for the erection of a building for their joint use, whose general exterior design should be of uniform character and appearance, one half to be built by the city, at its own expense, and the other by the county, was still in force. The county had previously appointed its own architect. The contract between the city and the defendant in error was not based on the idea that there was to be but one design prepared, and that by him, which was to be satisfactory both to the city and county, but that both architects were to devise plans, and there was to be a general conference and a selection of one or the other of these plans, or the adoption of some compromise plan.

The city could not reasonably expect any architect to give his time and labor in devising plans for a building on the condition that he was to receive no compensation unless he procured the assent to his plans of another body of fifteen persons, which had employed its own architect to devise plans for the same building. No prudent man would agree to such a con tract.

It seems reasonably clear from the contract itself, and the circumstances under which it was made, that the city took the risk of securing the agreement of the county to some plan. It was indispensable that there should be some concurrence of views between the authorities of the city and county touching the external appearance of the building. The antecedent contract between the city and the county required this. It was clear that sooner or later the authorities of the city and county would concur in some common plan. The contract between the city and the defendant in error was for his services to aid in devising a plan to which the county might be induced to accede. The county at the same time had its own architect at

work devising a plan for the same building. The city and county would thus have two designs from which to make their choice, and, if neither were acceptable, have two architects to devise a compromise plan.

The preparation of a design for the exterior of the building was but a small part of the work which the defendant in error contracted to do. He was required to prepare plans and specifications for excavations for the foundations, and for the foundations themselves, and for the sub-basement; to prepare plans and specifications for the interior of the building, to divide it into the apartments necessary to accommodate the business of the city; to lay off the corridors, halls, staircases; to devise all the interior conveniences and decorations of a large and costly building; to select and specify the materials of every description that were to be used; to decide upon and make drawings for the structure of the inside walls, the floor, the roof; to make designs for the wood-work; and to provide for plastering, plumbing, and painting. All these matters were to be settled by him, and minute and detailed specifications were to be prepared for the entire work; so that contractors might be able to bid intelligently.

The work which the defendant in error undertook to do, in preparing the necessary plans and specifications for the building, was a vast one, requiring much time and great labor and skill on his part, and the aid of draftsmen, clerks, and other assistants. To construe his contract to mean that he was to do all this work and receive no compensation for it unless he could induce the board of county commissioners to agree to his plan for the exterior design, and reject that of their own architect, is to give it a meaning which in our judgment neither of the parties to it ever contemplated. It is no reply to this to say that he might have prepared his designs for the exterior of the building and secured the concurrence of the county board therein before proceeding with the residue of the work. There is nothing in the contract which indicates that the defendant in error was expected to do this. If such had been the purpose of the parties, it would have been easy to express it. On the contrary, by the very terms of the contract, it was as much the duty of the city board of public works as of the defendant in

error to procure the approval by the county board of the exterior design prepared by him.

The fact is apparent that the contingency of a disagreement between the city and county authorities in regard to the exterior plan of the building was not anticipated, and no provision was made for it. The thing to be done by the defendant in error was "to prepare the necessary plans and specifications for the erection of the new city hall and court-house," and to superintend the erection of the building when the exterior design had been agreed upon by himself, the board of public works of the city, and the county commissioners.

The proceedings of the city council show that this was the construction which it put on its contract with the defendant in error. In November, 1875, when it was found that his plans and those of Egan did not harmonize, the city council passed a resolution calling a joint meeting of the mayor, the board of public works, the building committee of the council, and the president and building committee of the county board, to consult about some plan by which the difference between the city and county architects might be satisfactorily settled. The result of the meeting was a direction to the two architects to prepare a compromise plan for the exterior of the building.

The compromise plan prepared by Egan appears to have been adopted by a joint meeting of the same parties held on a subsequent day. Nevertheless, afterwards, on Jan. 13, 1876, the city council passed a resolution by which they directed the board of public works to adopt certain compromise plans prepared by the defendant in error.

All this shows that it was not considered by the city that the contract imposed on the defendant in error alone the duty of bringing about the assent to his plans of the county board.

If the construction we have put upon the contract is the correct one, then the defendant in error having performed a part of it according to its terms, and having been prevented from performing the residue by the failure of the other party to do its part, may receive compensation for the work actually performed. *Planché* v. *Colburn*, 8 Bing. 14; *Goodman* v.

*Pocock,* 15 Q. B. 576 ; *Hall* v. *Rupley,* 10 Pa. St. 231. *Moulton* v. *Trask,* 9 Metc. (Mass.) 577 ; *Hoagland* v. *Moore,* 2 Blackf. (Ind.) 167 ; *Derby* v. *Johnson,* 21 Vt. 17.

This, in effect, disposes of the assignments of error.   All of them turn upon the construction of the contract between the parties.

If the defendant was not bound by the contract to obtain the assent of the county board to his plans before he was entitled to compensation, then all the instructions given by the court were correct, and none of the assignments of error are well founded.

*Judgment affirmed.*