REISER COMPANY, INC., *v.* BALTIMORE RADIO
SHOW, INC.

·[No. 26, October Term, 1935.]

*Decided November 23rd, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, J. J.

*Jacob S. New,* with whom were *Julius H. Wyman* and *John Hampton* on the brief, for the appellant.

*William L. Marbury, Jr.,* and *G. Van Velsor Wolf,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Baltimore Radio Show, Inc., conducts in Baltimore, Md., a radio broadcasting business, under the station name of W-F-B-R. As a part of that business, it undertakes to broadcast information concerning various commercial products at rates given in a trade publication known as Standard Rate and Data.

The Lawrence C. Gumbinner Advertising Agency, called herein Gumbinner, operates an advertising business in which it undertakes to negotiate contracts for advertising the products of its patrons in newspapers and magazines and by radio. For that service it receives a commission of fifteen per cent. of the cost of the advertisement, which is paid by the publisher who does the physical work of giving publicity to the advertisement. That is to say, the client or patron pays the price required by the publisher to the advertising agency, and it pays that price to the publisher less fifteen per cent. which it retains for its services.

Reiser Company, Inc., is a corporation which sells a variety of toilet accessories, advertised under the trade name of Venida.

In July, 1933, one I. Raymond Spector, an agent of Gumbinner, approached Jack Stewart, general manager of W-F-B-R, to negotiate for broadcasting time over that station for Venida products, and as a result of the negotiations, the following contract was executed:

"Jack Stewart (Salesman)
"W-F-B-R
"The Baltimore Radio Show, Inc.
"General Offices and Studios:
"Seven Saint Paul Street
"Baltimore, Maryland

"We, the Subscriber, agree to Broadcast through Station W-F-B-R for a period of twice Weekly, for a total of 26 broadcasts, at a cost of $64.80 per broadcast, a total of $1,684.80—which we agree to pay weekly as billed.

"It is understood that our broadcast begins on July 17, 1933, and ends after 26 broadcasts. Time to be selected by Station—7:00 to 10:00 P. M. Except Sat. or Sun. 15% Agency Commission to Lawrence C. Gumbinner Advertising Agency. Time selected—Mon. and Wed. 8:00-8:15 P. M. * * *

"We also authorize the above company to secure talent for our broadcast at the rate of $......  None per broadcast. Under all circumstances any talent used must be mutually acceptable to both parties to this contract.

"We further agree that all Broadcast Programs including advertising matter injected into our broadcast must be submitted to W-F-B-R 48 hours in advance of broadcast. The said programs and advertising matter are subject to censorship by your broadcast director. * * *

"It is further agreed that this contract is subject to the Rules, Orders and Regulations of the Federal Radio Commission, and also of the American Society of Composers, Authors and Publishers.

"The contract not binding on The Baltimore Radio Show, Inc., until signed by an officer of said corporation.

"It is understood and agreed that the foregoing embodies all understandings and agreements between parties hereto, and that no representations, verbal or written, shall modify, add to, or alter the terms hereof unless approved by an officer of the Broadcaster in writing.

"Lawrence C. Gumbinner Advertising
Agency, Subscriber
"9 E. 41 St., New York City
Per [Signed] I. Raymond Spector

"Date July 7, 1933.

"The Baltimore Radio Show, Inc.
          "W-F-B-R
    "By [Signed]  Jack Stewart."

In the course of the negotiations resulting in that contract, Spector told Stewart that "they" would expect to receive "three hundred cartons a week." Stewart replied that "our station does not accept business on a contingent basis," but on July 11th, 1933, sent to Gumbinner this letter:

"In accordance with the contract for Venida, on this station, we agree to furnish you with, at least, 300 inquiries per week. In the event that this amount of inquiries are not received, we will continue the life of the contract until such time as this quota of inquiries have been received.

"We also agree that, in the event that the programs do not pull, and that we are unable to get the required amount of 300 inquiries per week, that we may have the privilege of discontinuing the contract at any time, by giving one week's notice. We feel that due to the fact that this is quite different practice by accepting this type of contract than we have been doing, and are willing to give it a trial, that we should reserve this right.

"Hoping to see you on my next visit to New York, and with kindest personal regards, I am,
          "Sincerely yours,
          "The Baltimore Radio Shows, Inc.
            "[Signed]  Jack Stewart,
                "Jack Stewart, Director.
"Owned and Operated by the Baltimore Radio Shows, Incorporated."

Gumbinner demurred to the clause permitting W-F-B-R to cancel the contract on one week's notice and suggested that W-F-B-R have the right to cancel only after four weeks and then upon two weeks' notice, and that change was accepted by W-F-B-R in a letter signed by the Baltimore Radio Shows, Inc., through Stewart, and by Stewart as director, on July 14th, 1933.

"The inquiries" contemplated in the letter of July 11th, actually received in the period in which the twenty-six broadcasts covered by the agreement of July 7th, were given, fell far short of the anticipated number of 300 per week, and at the expiration of that period W-F-B-R continued to broadcast Venida advertisements without further charge until January or February, 1934, when a total of 830 "inquiries" or "cartons" had been received by the Reiser Company. W-F-B-R then refused to continue the free broadcasting, and Reiser Company, Inc., brought this action to recover $1,127.30, on the theory that Gumbinner executed the contract with the appellee as its agent, that under that contract the appellee agreed to furnish the appellant 3,900 "inquiries" for $1,684.80, that it paid that sum to the appellee, but had received only 830 "inquiries," and that it is therefore entitled to recover back from it the money which it paid for inquiries it did not receive.

To that demand the appellee set up these defenses: (1) That the only contract between the parties was that dated July 7th, 1933; that the letter dated July 11th, upon which appellant relies as a part of the contract, was wholly unauthorized, because, it says, Stewart, who signed that letter as for it, exceeded his authority in so doing; (2) that assuming that that letter was part of the contract, its terms were too indefinite and incomplete to constitute a valid and enforceable contract; and (3) that the consideration for it was illusory and inadequate.

The case was tried before the court sitting as a jury and at the conclusion of the evidence the court instructed itself as a jury to return a verdict for the defendant, and from the judgment on that verdict Reiser Company appealed.

The appeal submits two questions: One, Can the supplementary agreement of July 11th, 1933, be treated as the act of appellee? The other, Did it constitute an enforceable contract?

The first question presents little difficulty.

The appellee assumes that the writing of July 7th, 1933,

was a valid and binding agreement, but that the supplementary agreement was unauthorized, because it says Barroll, who was an officer, did execute the first paper, but did not execute the second. But that position is not tenable. Barroll never did execute the first paper; what he did was to initial it when it was presented to him by Stewart, and the fact that he did initial it was never brought to the knowledge of the appellant, but was a mere private transaction between two agents of the corporation, and so far as appellant knew, both papers were executed in the same way, by the same authority, or want of authority, and if one was valid so was the other, and both together constituted one agreement. But assuming, without laboring the point, that neither was authorized, nevertheless there is evidence to show that appellee, with knowledge of all material facts, adopted and confirmed the agreement embodied in the two papers. Such conduct, commonly and for convenience called "ratification," has the effect of binding the corporation to perform the terms of the agreement as fully as though it had in fact been authorized in the first place. *Grape Sugar etc. Co. v. Small*, 40 Md. 395, 400; *Adams' Express Co. v. Trego*, 35 Md. 47, 69; *Mechem on Agency*, secs. 300, 350, 382, 483; *Am. L. Inst., Restatement of Law of Agency*, sec. 100.

Broadcasting under the agreements was to begin July 17th, but before that date, on July 12th, Spector complained of a term in the letter of July 11th, and appellee, in a letter signed in its name by Stewart, addressed to Spector as agent for Gumbinner, agreed to change the objectionable term. The broadcasting continued for the full term of thirteen weeks; appellant paid and appellee accepted the price fixed in the agreement; on October 16th, appellee, by Stewart, its "director," in a telegram asked authority to spend money on "talent" to make the advertising more effective, and on the same day Spector wired the authority; on October 17th, appellee, by Stewart, asked authority to start the new program, and again Spector wired the authority; on September 28th Spector visited the station and talked over the performance of

the agreement with Stewart; after the expiration of the six weeks' term, appellee continued to charge and accept money for extra "talent" but made no further charges for broadcasting, but continued to broadcast the programs without charge until some time in January or February, 1934, when the charge for the free broadcasting at standard rates would have been $2,750. On November 3rd, 1933, Barroll, the executive vice president of the appellee, wired Gumbinner that it must "ask national rates for Venida time in future. Wire acceptance or we will discontinue program," and in reply Spector called Barroll's attention to the letter of July 11th; after that Stewart visited Spector; still later appellee continued to charge and accept money for extra talent, but continued to give the broadcasts free, and throughout that period there was an exchange of correspondence between Gumbinner and appellee which must have been accessible to the latter in its files. Under such circumstances, it must be assumed that the appellee adopted and confirmed the agreement constituted by the letters of July 7th and July 11th *(Restatement of Law of Agency, Am. Law Inst.* ch. 4; *Mechem on Agency* [2nd Ed.] secs. 347, 433, 435, 430, 451 *et seq.,* 405, 406, 368; *Bannon v. Warfield.* 42 Md. 22, 42), even though it be conceded that the knowledge of Stewart may not be imputed to his principal. *Mechem on Agency,* sec. 407.

The controlling question in the case, however, is whether, conceding that the agreement may be dealt with as though validly authorized, does it constitute an enforceable contract?

An indispensable element of a legally enforceable contract is that its language must not only be sufficiently definite to clearly inform the parties of what they may be called upon by its terms to do, but that the courts which may be required to enforce it may also be able to learn from it the purpose and intention of the parties. *Brantly on Contracts,* page 25; *Restatement, Contracts, Am. Law Inst.* sec. 32; *Thomson v. Gortner,* 73 Md. 474, 21 A. 371; *Williston on Contracts,* secs. 24, 37.

As shown above, the appellee promised to furnish Gumbinner "300 inquiries per week," and if it failed in that undertaking, to "continue the life of the contract until such time as this quota of inquiries have been received." The contract itself does not define "inquiries"; no explanation of the meaning of the word is to be found in the evidence, and it must be given its usual literary meaning, which is, a question, a query, a request for information. The promise was that "we," the appellee, agree to furnish "you," Gumbinner, with the inquiries. It is consistent with that language that appellee could have furnished its own inquiries, but it is obvious both as a matter of common sense and from the evidence that it meant that the inquiries were to come from some outside source, but the contract does not indicate from what source, and in a letter of November 26th, 1933, Gumbinner states that the guarantee calls for "3900 cartons," as though "inquiry" was intended to mean "carton," and in a letter of November 23rd, it said, "It is true we have a definite contract understanding calling for a guarantee of 3900 cartons," so that when appellant complained that it had not received the stipulated number of inquiries it meant that it had not received that number of "cartons." But the record also fails to disclose what is meant by "cartons." It does not appear from the contract, but it may be imagined from the dealings and correspondence of the parties that the inquiries and cartons were to be secured by some premium offered as an inducement, and that attention was to be called to the advertisement by some entertainment program furnished by Gumbinner to accompany the advertising matter in the broadcast, but any such inference would be conjectural and speculative. Nor does it appear either from the contract or from the evidence whether the inquiries were to be from persons who had actually purchased Venida products, whether the cartons were required as evidence of such purchases, whether the premiums were to be given in consideration of both the purchase and the inquiry, or, if they were for purchases, the amount of the purchase necessary to secure

them; but it does appear from the undisputed evidence that the performance of the contract depended necessarily upon terms and conditions which were defined neither in the contract nor in the evidence. And since performance of the promise to furnish "300 inquiries per week" cannot be measured unless the terms and conditions relied upon to produce that result are known, it is impossible to determine whether appellee has performed its contract, because while it does appear that appellant was to do something to make performance possible, neither the contract nor any modification thereof defines what it was to do. Under such circumstances, the contract was too indefinite to be legally enforceable, and the defendant's demurrer prayer was properly granted. *Am. Law Inst., Restatement, Contracts*, sec. 32. The judgment appealed from will therefore be affirmed.

*Judgment affirmed, with costs.*