58 F.Supp. 1011 (1945)
H. W. KASTOR & SONS ADVERTISING CO., Inc.,
v.
GROVE LABORATORIES, Inc.
No. 2706.
District Court, E. D. Missouri, E. D.
February 21, 1945.
*1012 Thompson, Mitchell, Thompson & Young, and Samuel A. Mitchell and Richard D. Shewmaker, all of St. Louis, Mo., for plaintiff.
Nagel, Kirby, Orrick & Shepley, by Ethan A. H. Shepley and William R. Bascom, all of St. Louis, Mo., for defendant.
HULEN, District Judge.
The complaint in this case is in three counts. By counts 1 and 2, plaintiff seeks damages for breach of an express contract. County 3 is on quantum meruit. Plaintiff's business consists in the operation of an advertising agency. Defendant is engaged in the business of manufacturing and selling various medical preparations and, among others, a certain product known as "Four Way Cold Tablets."
*1013 By count 1 of the complaint, plaintiff charges the defendant contracted with the plaintiff in April or May 1943, for the plaintiff to prepare and carry out an advertising campaign for 1943-44 of Four Way Cold Tablets throughout the United States, and agreed that the total amount to be expended by defendant for such advertising "would be approximately $500,000," and that the defendant agreed to pay plaintiff for its services in such campaign the sum of $75,000. Count 2 of the complaint refers to the same agreement, but pleads in the alternative that defendant entered into a contract with the plaintiff whereby the plaintiff was to prepare and carry out an advertising campaign for the 1943-44 advertising season on Four Way Cold Tablets throughout the United States, "and defendant agreed that plaintiff and no other advertising agency or person would devise, plan, arrange for, prepare and carry out defendant's advertising campaign for Four Way Cold Tablets." Counts 1 and 2 allege that the plaintiff entered upon the performance of the obligations imposed upon it by the contract, but that the defendant on or about the 20th day of July, 1943, repudiated the contract and refused to permit plaintiff to carry out its terms. Count 2 alleges that the defendant did have an advertising campaign for 1943-44, national in scope, for Four Way Cold Tablets, and expended approximately $500,000. Plaintiff prays for damages in the sum of $75,000 under both count 1 and count 2 of the Complaint. Count 3 alleges that at the special instance and request of the defendant, plaintiff commenced on or about April 2, 1943, to prepare an advertising campaign for Four Way Cold Tablets for the 1943-44 advertising season and performed duties in connection with the campaign up until the 20th day of July, 1943, when the defendant severed the relationship. The value of the services performed between the second day of April and the 20th day of July, 1943, is alleged to be $75,000. The defense, upon which the case was tried and briefed, is an alleged general custom throughout the United States that the relationship between an advertising agent and its clients may be terminated at will by either the agency or the client and that in the event of termination by the client there is no obligation on the part of the client to compensate the advertising agency for any work done or services performed by it prior to such termination.
Facts about which there is no dispute are: In 1932 Harry B. Cohen, employed by the plaintiff as account executive, approached the defendant and solicited some of their advertising business. Mr. Cohen at that time learned that the defendant had no products available for advertising which were not being served by some other advertising agency. The result of Mr. Cohen's interviews with the defendant was that Mr. Goldsmith, an executive officer of the defendant, told Mr. Cohen, "You bring us the product, and we will give you the advertising." Mr. Goldsmith gave Mr. Cohen some chocolate coated bromoquinine tablets as a product containing possibilities. Mr. Cohen took the suggestion for chocolate coated bromo-quinine tablets back to the Chicago office of plaintiff and returned some time later with a suggested combination of four ingredients from medicines which were generally recognized as effective in the treatment of coldsaspirin, quinine, bicarbonate of soda, and cascara. Out of these conferences Four Way Cold Tablets were created. "Aspirin and quinine were put in for pain relief and fever reduction, bicarbonate of soda for an alkalizing agent." Magnesium hydroxide was substituted for bicarbonate of soda, and yellow phenolphthalein was substituted for cascara. Plaintiff was employed by defendant to carry out a newspaper advertising campaign of the new product in "1932 or 1933." The newspaper campaign was not successful. By 1936-37, defendant was carrying on an annual radio advertising campaign, through plaintiff's service, and the new product was on the road to success, with the result that expenditures for radio advertising were made by the defendant through the plaintiff from 1934 to 1943 as follows:

1934-35 $10,038
1935-36 29,209
1936-37 88,342
1937-38 140,374
1938-39 140,051
1939-40 199,468
1940-41 197,284
1941-42 244,149
1942-43 365,235

Plaintiff's compensation was, by custom recognized by both parties, fifteen per cent of the amount spent for advertising.
*1014 The advertising season of Four Way Cold Tablets generally was from October to March. Each yearly advertising campaign was the subject of negotiation as to the amount that would be spent, the copy that would be used, and the stations over which radio broadcasts would be made.
Relations between plaintiff and defendant were satisfactory until July 2, 1943. On April 3, previous, Mr. Cohen had conferred with the defendant in St. Louis in regard to an "appropriation" for the advertising campaign for Four Way Cold Tablets for the coming season. At this time Mr. Cohen "solicited an appropriation of $500,000," and apparently sold the defendant on the idea, who through their Mr. Goldsmith "approved the proposal" and gave the plaintiff "that appropriation," as an estimate of what would be spent. The plaintiff, with defendant's knowledge and at its direction, proceeded with work preparatory to the campaign of advertising Four Way Cold Tablets on the basis of a $500,000 appropriation. On July 2, 1943, the defendant notified the plaintiff that they had decided to run a test on Four Way Cold Tablets in nine southeastern states through another advertising agency, for which the defendant had authorized an expenditure of $75,000. At this time the defendant informed the plaintiff that "Your total budget for Four Way Cold Tablets for the rest of the country" was reduced to $425,000. On plaintiff's receiving notice of the test to be made by another advertising agency on Four Way Cold Tablets, Mr. Cohen immediately called upon the defendant, and in effect not only questioned the judgment of the defendant in running a test campaign on Four Way Cold Tablets through another advertising agency, but objected to the reduction in the appropriation given to the plaintiff. Mr. Goldsmith informed Mr. Cohen that it was their custom to run tests of their products being advertised by various advertising agencies. Mr. Cohen was unable to convince the defendant that they should change their plan on the test for Four Way Cold Tablets. The conference terminated when Mr. Cohen, in effect, informed the defendant that the plaintiff felt that "the situation on Four Way Cold Tablets and our relation to Grove Laboratories on Four Way Cold Tablets was different than the average account in the hands of an advertising agency; that he (Mr. R. H. Kastor) felt we had a peculiar relation based on our relationship in 1932, on Mr. Goldsmith's statement, `You bring us the product and we will give you the advertising;' that I was sure Mr. Kastor would try to enforce such contractual relationship," unless the defendant cancelled its test on Four Way Cold Tablets. This challenge to the defendant was accepted, apparently in no uncertain terms, and on July 20, 1943, the defendant (Plaintiff's Exhibit 5) notified plaintiff that it must "sever our relations with the Kastor Agency" because the claim of "Mr. R. H. Kastor * * * of a legal interest in Four Way Cold Tablets is wholly unfounded and constitutes a threat which we cannot permit to exist."
The extent of services performed by the plaintiff between April 2, 1943, and July 20, 1943, on the Four Way Cold Tablet 1943-44 advertising campaign is a matter upon which the evidence is in conflict. Generally plaintiff's testimony was to the effect that substantially all ("95%") of the creative work had been done by July 20th. Defendant's evidence was that substantially all of the work remained to be done after July 20th.
The record does not show any claim made by the plaintiff to the defendant, prior to the filing of this case, that the defendant was under contract with the plaintiff either to spend $500,000 for its 1943-44 advertising campaign for Four Way Cold Tablets or, if it did have an advertising campaign, that no other advertising agency but the plaintiff was to conduct same, as referred to in counts 1 and 2 of the complaint. Plaintiff addressed a letter to the defendant on July 30, 1943, representing that "practically all of the agency work had been done for" the coming season on Four Way Cold Tablet advertising campaign, and on that basis informed the defendant that they would bill them with "15% of the amount of money you spend for advertising," which they estimated would approximate $75,000.
I. Counts 1 and 2 of the complaint being based on an express contract, we will consider the evidence with reference to these two counts under one heading. The substance of count I of the complaint is that the "defendant agreed that the total amount to be expended * * * for * * * advertising should and would approximate $500,000" for the 1943-44 Four Way Cold Tablet advertising campaign, and that plaintiff was to arrange for, prepare and carry out the campaign. Count 2 alleges *1015 that "defendant agreed that plaintiff and no other advertising agency or other person should devise, plan, arrange for * * * and carry out its advertising campaign for Four Way Cold Tablets for the 1943-44 season * * *" and it was agreed that the campaign should be arranged and planned on the basis of an estimated expenditure of $500,000. As we understand the position of the plaintiff, it is that the conference between the representatives of plaintiff and defendant on April 2, 1943, constituted the contract relied upon in counts 1 and 2 of the complaint. That record is meager.
"A. I went to Mr. Goldsmith's office, and after talking about various matters explained to him that this year I thought we ought to get a much earlier start on the Four Way Cold Tablet advertising because there was a great rush for radio time; because of the great difficulties we had with the copy censorship
"Q. By copy censorship, you mean their censors? A. Their censors. And asked him for an increased appropriation based on the excellent sales results the previous year. Mr. Goldsmith drew out his budget figures and discussed with me the percentage he was contemplating allocating to Four Way Cold Tablets.
"Q. That is, between Four Way and the other products of the corporation? A. He discussed specifically Four Way Cold Tablets, but in the discussion he discussed what percentage he was going to place on Bromo Quinine, or Grove Tablets as they were known then; and I made a recommendation that I thought a certain volume of business could easily be obtained on Four Way Cold Tablets, based on the preceding year, and solicited an appropriation of five hundred thousand dollars, because the sales volume, which our study of business indicated to be possible, would justify an expenditure of that much money. Mr. Goldsmith approved my proposal, gave me that appropriation, I thanked him for it and said that made me very happy. I went back to Mr. Wagner's office and told him, `Bill, I obtained this appropriation and was very much pleased with it.' * * *
"Q. Yes, you might go ahead. Cover that day. A. Well, I have pretty well covered that day. I was very much pleased in getting that order for the new campaign."
We are unable to draw a conclusion from this testimony supporting either count 1 or 2 of plaintiff's complaint. This conversation should be considered in connection with the relationship of the parties that extended over the past twelve years. In 1932 the defendant told the plaintiff, "You bring us the product and we will give you the advertising," and out of the negotiations at that time Four Way Cold Tablets came into being and plaintiff's advertising campaign started. There is no evidence upon which a finding can be based that the relationship was to continue for any fixed period of time. This Court cannot make a contract for the parties. We believe the reasonable deduction to be made from the evidence is that the relationship between plaintiff and defendant was one of agency, to continue so long as mutually satisfactory, subject to termination by either party at any time. That this was the understanding of the parties is evidenced on the part of the defendant by its termination of the relationship when the plaintiff challenged its right to conduct its own business and on the part of the plaintiff by accepting the termination and basing its demands for compensation on the basis of work performed rather than breach of an express contract. See plaintiff's Exhibit 6. As to the cases relied upon by the plaintiff: N. W. Ayer & Son v. United States Rubber Co., 282 Pa. 404, 128 A. 103, and Ayer v. Devlin, 1914, 179 Mich. 81, 146 N.W. 257, were cases of express contracts for a definite period; in the case of Reiser Co., Inc., v. Baltimore, etc., 169 Md. 306, 181 A. 465, the contract was made by an advertising agency on behalf of its principal for "twenty-six broadcasts" at a definite figure per broadcast; the case of Bamberger Broadcasting Service, Inc., v. William Irving Hamilton, Inc., D. C., 33 F.Supp. 273, was a case based on a written contract for a definite period of time; the case of Huber Hoge, Inc., v. Smith & Wesson, Inc., D. C., 33 F.2d 923, affirmed, 1 Cir., 32 F.2d 699, involved a controversy between an advertising agency and an advertiser, the agency claiming it was entitled to commissions on space in magazines which it had reserved but not contracted for at the time of cancellation of the relationship between the advertiser and the agency, and in this case there was an agreement, represented by letters, providing that the agreement was terminable at any time upon notificationthe advertising agency being protected "on current commitments" made on request of the advertiser. Neither of the cases cited by the plaintiff, in our opinion, sustains its position *1016 of express contract as set forth in counts 1 and 2 of the complaint, on the record made in this case. Manifestly the plaintiff must admit that the relationship between plaintiff and defendant was subject to termination at some date. Under the circumstances presented, it serves plaintiff's purpose now to make that date as of the close of the advertising season of 1943-44. The record does not support this contention.
As to the relationship generally of an advertising agency, conducting a radio advertising campaign and its client, see 2 Socolow, The Law of Radio Broadcasting, § 339 (1939): "Upon its engagement by the sponsor to plan and execute an advertising campaign, the agency usually functions as an agent. It acts for and represents the client in dealings with the broadcast station, the program producer, the artists and all other persons concerned in the program sponsored by the client. * * * In view of these qualifications, the advertising agency has the legal characteristics of an agent."
II. The defendant on April 2, 1943, having, by its conduct, directed the plaintiff to prepare and execute its 1943-44 advertising campaign for Four Way Cold Tablets and from previous experience knowing that this would entail certain operations on the part of the plaintiff, must be held to have employed the plaintiff in those respects, as its agent, and services in pursuance of the direction having been performed at the instance and request of defendant, the defendant is liable under count 3 of the complaint for the reasonable value of such servicesunless the plaintiff is barred from recovery because of the customs and usages of the advertising business to the effect that under the circumstances presented there is no obligation on the part of the advertiser to compensate the advertising agency for any work done or service performed by it prior to the termination of the relationship. The defendant raises a further issue by brief filed, to the effect that it received no benefit from the services performed by the plaintiff in preparing the 1943-44 Four Way Cold Tablet advertising campaign between April 2 and July 20, 1943.
As to the defendant's claim of no benefit from plaintiff's services, we are not convinced that the record supports this contention. Defendant instructed the plaintiff to turn over to another advertising agency radio contracts and information with regard to the progress of negotiations with various radio stations for the coming campaign as well as copy which had been prepared. Plaintiff furnished advice and counsel on the appropriation for the 1943-44 season. Under the situation here presented, the fact, if it be a fact, that the agency which took over the Four Way Cold Tablet campaign from the plaintiff did not see fit to use the material which had been prepared by the plaintiff and to avail itself of the information accumulated by the plaintiff did not defeat the claim for compensation for the reasonable value of the services plaintiff had rendered at the instance and request of the defendant. The general rule is stated by Williston, Contracts, Rev.Ed., § 1976 (1938):
"The decisions in the preceding section (plaintiff's performance excused through destruction of subject-matter which he was employed to alter or repair) denying recovery have been supported on the ground that the defendant has derived no benefit from the work and labor which the plaintiff has done; but the right of recovery, generally, where full performance has been prevented by impossibility does not depend, under the American law at least, on whether the defendant has received and still retains a benefit at the time when further performance becomes impossible, nor on whether at any prior time the performance which the defendant received was advantageous to him. It is enough that the defendant has actually received in part performance of the contract something for which when completed he had agreed to pay a price." (Italics ours.) See also Sedgwick on Damages, 9th Ed., Vol. 2, p. 1308, § 650.
Missouri authority on the narrow point of "no benefit" is rather meager. The case of Haynes, Spencer & Co. v. Second Baptist Church, 1885, 88 Mo. 285, 57 Am.Rep. 413, has some bearing. The plaintiff corporation had agreed with defendant to install pews in its church, as well as other fixtures. Before the job was completed, the building burned without fault of either. Plaintiff sued for the value of the work and materials in place and on the floors. While the defense of no benefit was not mentioned by the Court in its opinion (and apparently was not brought up by counsel in briefat least it does not so appear in the abbreviated portion reprinted in the official report), the Court, if it considered *1017 the argument in theory, certainly gave no weight to it. Plaintiff was permitted to recover. Restitution was placed on the ground that there was an implied condition between the parties that the building be kept intact and in readiness until the plaintiff completed its job. See also Fabian v. Wasatch Orchard Co., 1912, 41 Utah 404, 125 P. 860, L.R.A.1916D, 892.
As to defendant's position that under established usage and custom defendant not only was at liberty to cancel the relationship between it and the plaintiff, but was not liable for any compensation to the plaintiff for services rendered up to the time of cancellation, see Restatement of the Law of Contracts, § 246, the law being stated as follows:
"When Usage is Operative upon Parties
"A usage is operative upon parties to a transaction where and only where
"(a) they manifest to each other an assent that the usage shall be operative, or
"(b) either party intends the effect of his words or other acts to be governed by the usage, and the other party knows or has reason to know this intention, or
"(c) the usage exists in such transactions and each party knows of the usage or it is generally known by persons under similar circumstances, unless either party knows or has reason to know that the other party has an intention inconsistent with the usage."
Section 247 of the Restatement of the Law of Contracts, on the subject of usage and custom, states the general principle to be: "A party cannot be bound by usage unless he either knows or has reason to know of its existence and nature. Accordingly one who seeks either to define language or to annex a term to a contract by means of usage must show either that the other party is actually aware of the usage, or that the existence of the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it. If so notorious, actual knowledge of it is immaterial."
As we understand the law, once a general custom has been established by proper evidence and requisite knowledge of the custom by the parties has been shown, the custom is to be treated as part of the understanding of the parties. Sherrill-Russell Lbr. Co. v. Krug Lumber Co., 216 Mo.App. 1, 10, 267 S.W. 14. Under the record in this case there is no evidence that either plaintiff or defendant had knowledge of the custom now relied on by the defendant at any time up to the date when the defendant severed its relationship with the plaintiff. Mr. Cohen of the plaintiff company testified he had never heard of such a custom. No one connected with the defendant testified on the subject.
The next question presented, in view of this state of the record, is: Was the custom relied upon by the defendant so notorious that a person of ordinary prudence in the position of plaintiff and defendant, in the exercise of ordinary care, would have been aware of it? The defendant offered the testimony of four witnesses to show custom in the advertising business, that there was no obligation of the advertiser to pay the agency for service performed prior to termination of the relationship. Mr. Albert B. Churchill, account executive and administrative officer, and vice-president of the Donahue & Coe Advertising Agency of New York City, with twenty-three years' experience in the advertising business, in answer to the question, "What is the general custom with respect to the obligation in the event of termination?" answered: "I presume what he has in mindyesthe obligation for any out of pocket expenses, any actual materials * * * or traveling expenses that might have been authorized by the advertiser to send somebody to a certain place to make an investigation. I can see certain items of that kind that might comprise an obligation that the advertiser should take care of, but they would be minor * * * Other than that, I cannot * * * figure any obligations that would be justified, until such a time as there had been performance, either by the operation of time on the radio station, or the insertion of space in a magazine or a newspaper, for which a commitment would be made by the advertising agency in the name of The Grove Laboratories, but the advertising agency would have to stand the expense until such time as they were able to collect that from The Grove Laboratories." This testimony does not prove the custom relied upon by the defendant.
Another witness offered on this phase of the case was Charles A. Standinger, employed by the Sherman K. Ellis Company, an advertising agency in New York. He has been in the advertising business *1018 twenty-five years. His testimony on the subject was as follows:
"A. It is that the advertiser has the right to terminate the relationship whenever it sees fit. * * *
"Q. Does yourdoes that custom provide anything further than the right to terminate? A. No. I don't seewhat further there is? If a fellow wants to quit, he quits.
"Q. What if work had been done? A. Well, you get paid your out-of-pocket expense.
"Q. What is out-of-pocket expense under that custom? A. You might have some printing that was in process of production, you might have some plates, you might have some recordings for a radio station for which you paid the talent and the recording company."
The testimony of Mr. Standinger carries no further probative value than does the testimony of Mr. Churchill in establishing custom. Mr. Standinger testified further on the subject as follows:
"A. After all, one agency has one way of doing business, and one, another, but I think that the general custom of the business is that it is the advertiser's right.
"Q. That is the policy? A. Unless there is a specific contract.
"Q. That the policy of the advertising agency is that the customer is always right?" A. I would say they are."
Mr. E. A. Schulenberg, secretary of the Gardner Advertising Company of St. Louis, Missouri, testified that he had been in the advertising business for over twenty-five years. His testimony was as follows:
"Q. Well, let me ask you this question, Mr. Schulenberg: You have just testified that there is a usage to the effect that in the absence of an express contract, the relationship between a client and an advertising agency can be terminated at will. Now, after that occurs, is there any generally accepted custom and usage with respect to the agency's customary demand for compensation upon such termination? A. There is.
"Q. What is that? A. Agencies collect for all out-of-pocket expenses, which will include, for example, mechanical charges, any services, for example, that might have been authorized by a client or an exclient."
The last witness offered in support of custom and usage was Enno D. Winius:
"Q. Is there any generally accepted custom and usage with respect to the agency's customary requirement for compensation upon such termination? A. Yes.
"Q. What is that? A. That the agency shall be reimbursed for the expenditures which were incurred with the authority and consent of the advertiser.
"Q. Expenditures in connection with maintaining its normal overhead department? A. No. Only for advertising expenditures for the client's account.
"Q. Could you illustrate the sort of expenditures you have in mind? A. Yes. If a client had authorized a posting contract for billboards, and we had placed the order on the strength of the client's written order, and had prepared the billboard copy and placed it, and then the client decided to cancel the arrangement with us, we would expect to be reimbursed or allowed to handle the billing or equivalent thereto on those expenditures authorized by him, with the copy approved.
"Q. Does that include mechanical charges, is that what you mean? A. Any expenditures incurred for the client's account, which would naturally include the mechanical expenditures.
"Q. It would not include, however, overhead expenses of the agency? A. It would not."
An examination of this testimony shows lack of uniformity, certainty and definiteness as to what the custom is. The testimony of these witnesses as to custom was in large part based on transactions in which the company they are connected with was interested. This will not suffice to establish the custom. Baker v. J. W. McMurry Contracting Co., 282 Mo. 685, 223 S.W. 45. There is no evidence to show to what extent the custom prevailed. There is no evidence to show how long the custom had been in effect. The evidence does not establish a custom so notorious that a person of ordinary prudence, in the position of plaintiff and defendant, would be charged with knowledge of its existence. A late text book on the subject states (without reference to any custom):
"The client's duties to the advertising agency:
"The relation between the advertising agency and its client imposes upon the latter *1019 the duty to compensate the agency for its services (citing Restatement, Agency (1933) Sec. 441). The compensation may be agreed to at the time of, or during the employment. It is not necessary that the services rendered by the agent be of benefit to the advertiser; the duty of the client to compensate the agent is independent thereof, (citing Schwartze v. Yearly (1869) 31 Md. 270). The client may not terminate the relation of agency so as to avoid payment, unless the contract specifically empowers it to do so, (citing Northwestern Port Huron Co. v. Zickrick (1913) 32 S.D. 28, 141 N.W. 983 [Ann.Cas.1915B, 166]). In the absence of fixed agreed compensation, the agency is entitled to the reasonable value of its services, (citing Bard v. Banigan (C.C.D. Conn.1889) 39 F. 13, aff'd (1890) 134 U.S. 291 [10 S.Ct. 565, 33 L.Ed. 932]; Hollis v. Weston (1892) 156 Mass. 357, 31 N.E. 483; Restatement, Agency (1933) Sec. 441) unless it has been guilty of dereliction of its duty as an agent." 2 Socolow, The Law of Radio Broadcasting, § 346 (1939).
Evidence to establish the custom relied on should have put beyond conjecture what the custom is. There should be evidence of known, uniform practice under certain and definite circumstances. Shane v. Lowden, 232 Mo.App. 360, 106 S.W.2d 956. The custom must be certain, settled and uniform. Ehrlich v. Aetna Life Ins. Co., 103 Mo. 231, 15 S.W. 530. Defendant, having asserted, as a bar to plaintiff's claim, custom and usage, carries the burden of proof. Defendant has failed to sustain that burden.
III. Determination of the amount of compensation due the plaintiff is not a simple problem. The parties shy from assisting the Court in deciding this question. Plaintiff claims the maximum, $75,000, and nothing less. Defendant counters with no concession, and nothing more. Defendant did offer evidence by a witness, experienced in the advertising business, that plaintiff had only performed ten per cent of the services required for the 1943-44 Four Way Cold Tablet advertising campaign, but did not choose to inquire the opinion of this witness as to the value of the services so performed.
In fixing compensation, the character of services to be performed should be taken into considerationthey were professional in character. Plaintiff maintained a large office force. Some of them, because of their experience and ability, are paid high salaries. This defendant expected a high grade of advertising service. The services of plaintiff in past years had contributed largely to the success of Four Way Cold Tablets. This case reminds the Court that advertising is not done to entertain. Its ultimate aim is sales returns to the advertiser. One may resent the form and method of advertising over the radio, but if cash return to the advertiser results in sufficient volume, the object has been, apparently, achieved. The best proof of plaintiff's efficiency is the results obtained. To run sales from nothing to over a million dollars in ten years, with gross profits such as to justify advertising expenditures of one-half million dollars at the end of ten years, was the result obtained. Defendant was satisfied. We look to additional standards for determining fair and just compensation. What plaintiff's compensation would have been had it serviced the entire 1943-44 campaign on Four Way Cold Tablets may be taken into consideration. See City of Chicago v. Tilley, 1881, 103 U.S. 146, 150, 26 L.Ed. 371. In that case the appellate court approved a charge to the jury containing the following direction: "It may then be considered as undisputed that Tilley was employed to prepare plans and specifications, and did some work in the line of his employment, and for this he is entitled to compensation, as far as possible, at the rate for which he was to do the whole work under the contract; that is to say, he had agreed to prepare plans and specifications and superintend the entire construction of the building for $37,500. He did a part of that work. He did something in the line of his duty; and if it is possible to ascertain from the proof and contract how must his compensation should be for the work, in the ratio of the entire compensation, the jury should arrive at that." See also Sedgwick on Damages, supra, p. 1336, § 662.
We shall not be able to determine with mathematical exactness the amount of compensation that will be just that is not required. See Palmer v. Connecticut Ry. & Lighting Co., 1940, 311 U.S. 544, loc. cit. 560, 61 S.Ct. 379, loc.cit. 385, 85 L.Ed. 336:
"The ways compensatory damages may be proven are many. The injured party is not to be barred from a fair recovery by impossible requirements. The wrongdoer *1020 should not be mulcted neither should he be permitted to escape under cover of a demand for nonexistent certainty. * * *
"Certainty in the fact of damage is essential. Certainty as to the amount goes no further than to require a basis for a reasoned conclusion. * * *
"This Court, recently, in an infringement case was required to appraise the value of opinion evidence as to the part of profits attributable to the use of a pirated play, an obviously elusive fact. No expert thought any greater percentage than ten should be attributed to the play. The lower court allowed twenty so that the award might by no possibility be too small. We approved because `what is required is not mathematical exactness but only a reasonable approximation. That, after all, is a matter of judgment * * *'"
In Hawkinson v. Johnston, the Eighth Circuit Court of Appeals, 1941, ruled (122 F.2d 724, loc. cit. 731, 137 A.L.R. 420): "The Missouri courts have recognized that `The rule that damages which are uncertain or contingent cannot be recovered * * * only applies to such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount.'"
With these principles in mind, we have arrived at a sum which we consider will fairly compensate the plaintiff for the services performed. These facts have been given consideration in doing so. Mr. Cohen, who apparently has a one-third interest in the recovery in this case, testified in detail to the operations of the plaintiff advertising agency, and presented a picture of great and continuous effort by skilled technicians, commencing on April 2, 1943, and extending up until the cancellation of plaintiff's services by the defendant on July 20, 1943. This witness testified that practically ninety-five per cent of the creative services for the 1943-44 campaign had been completed. In the letter of this witness to the defendant (Plaintiff's Exhibit 6), he stated that "practically all of the agency work had been done" for the campaign. This Court cannot escape the conclusion that the native or acquired proficiency of this witness in the advertising business was not entirely abandoned when the witness undertook to state to the Court the extent of the service of plaintiff and its value. Early in the testimony of Mr. Cohen, he described in detail the departments and functions of the plaintiff as an advertising agent, and the procedure of servicing an advertising account. From this description of the functions of the plaintiff agency, the Court finds itself unable to agree with this witness that ninety per cent of the work and service for the 1943-44 advertising campaign of Four Way Cold Tablets had been completed by July 20, 1943. After referring to the executive group, the first service described is that of the Copy Department. "They are specialists who have great experience and training in the art of preparing the advertising so as to sell the merchandise most effectively." At that period of time Mr. Seehoff was in charge of preparing copy for Four Way Cold Tablets. Mr. Seehoff testified that the defendant account was the only account he handled. He testified that he turned out the "basic piece of copy in a week's time," in 1943, and that after turning out the basic copy he did nothing further with regard to preparing copy"nothing ever came back to my hands to do anything further." Mr. Cohen testified that it was necessary to submit copy of proposed broadcasts to the Board of Censors, consisting of Mr. Small, who was the final censor, Mr. Shipp, Public Relations Counsel, and Dr. Harrison. On July 13th, plaintiff submitted to the various censors a number of copies of "announcements" of proposed broadcast copy for the coming season. Prior to this there had been several interviews and extended correspondence between plaintiff and defendant's representatives as to basic copy; however, it appears that "Basically, the style of copy on Four Way Cold Tablets has been the same since the initial test campaign was prepared originally by H. W. Kastor and Sons and built around the four medicines which originally were in Four Way Cold Tablets and the four therapeutic actions of that tablet." There had been minor changes each year, and were some changes in the copy submitted for the 1943-44 campaign, but the changes, while they might have been the result of deep study of men trained in the science of advertising, yet as far as the whole of the copy was concerned, the changes for the 1943-44 copy were minor as compared to the 1942-43 copy.
Mr. Cohen next describes the Art Department, which apparently had no functions in connection with the advertising of defendant's product. The Art Department *1021 is followed by a description of the Radio Production Department, "which is headed by a radio director, which deals with purchases, selection and analyses of various radio shows." As to broadcasting stations to be used for the 1943-44 campaign, Myrtle Meyers Nelson testified that she was employed by the company during 1943 until August 17th, as assistant to George Duram in the (radio) time buying department. She stated that only a small percentage of work had been done on the 1943-44 advertising campaign for Four Way Cold Tablets, and that as of July 20th, only five or six radio stations had been definitely committed on the program. Over one hundred were used. The Radio Traffic Department is described. Its function is to get script to the stations, "and instructions as to formation of the program, where commercials are to be stationed, length of time, and send them to them with full instructions," after the script has passed through the various censors. Manifestly this work remained to be done on the 1943-44 advertising campaign. The statistical department is described as a group of six or seven people who make a study of merchandising on behalf of the advertiser. Exhibits were introduced to indicate that the statistical department had gone over the defendant's sales of the previous year, which was the basis of the plaintiff's recommendations for the appropriation for the year 1943-44 campaign. The plaintiff has a librarian"to take off script from radio and check newspapers, and keeps an exact record of the progress we are making." This part of the program remained unexecuted on the 1943-44 advertising campaign. Mr. Cohen describes the Media Department, "which has to do with the purchase of advertising space or time." This department seems to overlap "The Radio Production Department."[1] The witness concluded his description of plaintiff's operations by reference to "our checking department, which checks the advertising to be sure it is inserted in accordance with our order; book-keeping, billing department and various minor departments of that sort." No work in this department had been done on the 1943-44 campaign by July 20th. There was further testimony from Mr. Cohen that during the broadcasting period changes were frequently made in the stations used, it being their purpose to switch from one station to another whenever an advantage appeared possible from such procedure; that script changes were made during the period of broadcasting, brought about by conditions not contemplated at the time the script was prepared. With this description of the operation of plaintiff agency applied to the record, we reach the conclusion that as compared with the total work necessary for the execution of defendant's 1943-44 advertising campaign for Four Way Cold Tablets, only a minor portion of the service was performed between April 2 and July 20, 1943. The period from April 2 to July 20 is approximately one-third of the period during which the 1943-44 campaign would have been in the office of the plaintiff for servicing had plaintiff executed the entire campaign. This Court would be disposed to base the plaintiff's recovery on the division of time actually spent between the start of the campaign and defendant's severing the relationship, as compared with the total time and what plaintiff's total compensation would have been, but the Court is of the opinion that, viewing the record as a whole, the plaintiff had not performed one-third of the total services which would have been performed, had they carried on to a completion the 1943-44 advertising campaign. We have considered the character and type of plaintiff's agency, the number of people employed, salaries paid to those engaged in the advertising business and paid by the plaintiff, and that the defendant expected to receive service of a high character from the plaintiff.

Findings of Fact.
1. The plaintiff is a Missouri corporation which is and for many years has been engaged in business as an advertising agency. The defendant is a Delaware corporation engaged in the business of manufacturing and selling certain proprietary medicines. The amount involved exceeds $3,000. The defendant has manufactured Four Way Cold Tablets since 1933.
2. The defendant's fiscal years began on May 1. The season in which the advertising of Four Way Cold Tablets was regularly presented to the public was from about October to March. Beginning with the advertising season of 1933-1934 and each fiscal year thereafter to and including the fiscal year of 1942-43, the plaintiff planned, *1022 prepared and carried out advertising campaigns for the purpose of advertising Four Way Cold Tablets and such advertising was done almost entirely by radio.
3. In 1932 the defendant had told the plaintiff that if plaintiff would bring the defendant a product the defendant would give the plaintiff the advertising of that product, with no commitment as to duration of such employment, and thereafter in 1933 the defendant suggested to plaintiff the idea of making and selling a cold tablet containing aspirin, quinine, a laxative and an anti-acid, and acting on and in accordance with this suggestion the defendant developed Four Way Cold Tablets.
4. It had been the regular practice and custom of the plaintiff and defendant in connection with the advertising of Four Way Cold Tablets that before the beginning of each advertising season, usually in May or June of each year, the plaintiff would solicit the defendant for an appropriation of money to be spent in the coming season's campaign for advertising Four Way Cold Tablets. Defendant would at such times make a tentative appropriation. After receiving such an appropriation the plaintiff regularly each year prepared and arranged for a campaign for the advertising of Four Way Cold Tablets and the defendant approved the same and the plaintiff proceeded to and did carry it out. The plaintiff contracted with radio stations and other media on its own credit but for the advertising of the defendant. The defendant regularly paid the plaintiff, as its compensation for its services in planning, preparing and carrying out each campaign, 15% of the total amount expended by the defendant for advertising in such campaign.
5. The plaintiff received no part of its compensation from radio stations or other advertising media. It is customary for advertising agencies to charge the advertisers, as compensation for their services, 15% of the total amount expended by the advertisers on the advertising campaigns planned, prepared and carried out by the agencies.
6. On April 2, 1943, the plaintiff solicited an appropriation from the defendant in the sum of $500,000 for the 1943-44 campaign for the advertising of Four Way Cold Tablets, and the defendant then and there authorized plaintiff to proceed to formulate plans, based on such estimated appropriation. Said $500,000 figure was suggested by the plaintiff because of an estimate made by the plaintiff that sales of Four Way Cold Tablets in the amount of $1,250,000 could be made if said amount were expended.
7. The defendant did not promise or agree, on April 2, 1943, or at any other time in connection with the 1943-44 Four Way Cold Tablet advertising schedule, to accept the recommendations of the plaintiff with respect to such schedule, including recommendations pertaining to geographical allocation of advertising expenditure, copy, and broadcasting time-buys, if such recommendations were satisfactory to the defendant; nor bind itself to conduct said advertising campaign through plaintiff and no one else.
8. It was a regularly established part of the defendant's business to have a campaign for the advertising of Four Way Cold Tablets during the advertising season of each year and such campaign was necessary if the defendant's manufacture and sale of Four Way Cold Tablets was to be profitable.
9. Both the plaintiff and defendant knew and understood whenever an appropriation for an advertising campaign was solicited by the plaintiff that the purpose of the solicitation and granting of such appropriation was to manifest an employment of the plaintiff as agent of the defendant, to plan, prepare and carry out the campaign represented by the appropriation, subject to termination of the employment by either party to it at any time.
10. The plaintiff knew that the defendant intended that the amount expended on advertising schedules for Four Way Cold Tablets, and, particularly, on the 1943-44 advertising schedule, should, at all times, remain subject to the unfettered control and judgment of the defendant and that the defendant never agreed or promised to spend a particular sum of money on such schedules and, particularly, that the defendant did not agree on April 2, 1943, to spend $500,000 on the 1943-44 Four Way Cold Tablet advertising schedule.
11. On April 2, 1943, plaintiff was employed by defendant to proceed to plan, prepare and carry out an advertising campaign for Four Way Cold Tablets for the 1943-1944 advertising season, to be presented to the public beginning about October 1, 1943, and ending about March, 1944, in the trade territory throughout the United *1023 States, such campaign to be presented and arranged for on the estimated basis of an expenditure by the defendant of $500,000 for the advertising to be done in the course of the campaign, the plaintiff's plans and preparations to be made to the satisfaction of the defendant and no contracts to be made by the plaintiff with radio stations without the prior approval of or subsequent ratification by the defendant and subject to cancellation on two weeks' notice. Plaintiff was to be compensated for its services at a sum equal to 15% of the total amount expended by the defendant for advertising in the course of such campaign.
12. On July 20, 1943, the defendant terminated its employment of plaintiff and notified plaintiff that its advertising campaign for Four Way Cold Tablets for the 1943-44 season would be carried out thereafter by another advertising agency.
13. The defendant, through another agency, expended for advertising in such campaign the sum of $487,306.00.
14. Between April 2, 1943, and July 20, 1943, the plaintiff, at the instance and direction of defendant, had done part of the planning for the 1943-44 campaign for the advertising of Four Way Cold Tablets, but had not substantially completed one-third of the servicing for said campaign. The services remaining to be done by the plaintiff in connection with said campaign were substantially more than double those which had been performed when the relation was terminated. The planning of the campaign required the exercise of professional skill and involved great responsibility.
15. The reasonable value of the services performed by plaintiff and rendered defendant, at defendant's direction and special instance, between April 2, 1943, and July 20, 1943, in connection with the 1943-44 Four Way Cold Tablet advertising campaign is $15,000.
16. The evidence does not show that during the period in controversy, in the advertising business throughout the United States (in the absence of an express agreement or contract by the parties to the contrary), there was a uniformly well-established general custom and usage to the effect that if the relationship between advertiser and advertising agents was terminated at the will of either party, that no charge or demand for compensation would be made by the advertising agency of the advertiser (excepting for out-of-pocket expenditures by the advertising agency for talent, for art work, for mechanical work, and excepting for media space obtained by the advertising agency and used by the advertiser) for services performed of the character, for which plaintiff seeks compensation in this case. There is no evidence that either plaintiff or defendant had knowledge of any custom that no charge or claim for services would be made on termination of the relationship.

Conclusions of Law.
1. The Court has jurisdiction of the subject matter and of the parties to this suit.
2. Defendant is presumed to have agreed to compensate the plaintiff for the fair and reasonable value of services rendered by the plaintiff at the instance and request of the defendant subsequent to April 2nd and prior to termination of the agency relationship on July 20, 1943.
3. Defendant had the right to terminate plaintiff's agency and employment at will.
4. Plaintiff's claim for the recovery of the reasonable value of the services performed by it in preparing and servicing the 1943-44 Four Way Cold Tablet advertising campaign at the direction of defendant between April 2nd and July 20th, 1943, if otherwise enforceable, right of recovery is not conditioned on defendant's receiving the benefits of the service.
5. To bar recovery by plaintiff by a custom that on termination of advertising agency relationship no compensation for services performed is recoverable, such custom must have been proven to be uniform, well established, and, in the absence of knowledge by the parties of such custom, to be so notorious as to impute knowledge thereof to the parties.
6. Plaintiff is entitled to judgment against the defendant, on the third count of the Complaint, in the sum of $15,000. Judgment for defendants on counts 1 and 2.
NOTES
[1] Which may only deal with "Shows"none of which had been contracted for by July 20, 1943.