VERA SHANE, ADMINISTRATRIX, ESTATE OF EDWIN SHANE, DECEASED, RESPONDENT, v. FRANK O. LOWDEN ET AL., TRUSTEES, FOR C. R. I. & P. RY. CO., APPELLANTS.—106 S. W. (2d) 956.

Kansas City Court of Appeals. May 24, 1937.

*Herman Epstein, Thomas C. Swanson* and *Sloane Turgeon* for respondent.

*Luther Burns, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

REYNOLDS, J.—This suit originated in the circuit court of Cass county. The petition was filed therein on April 16, 1935. Later, an amended petition was filed. The suit is by the plaintiff, administratrix of the estate of her deceased husband, Edwin C. Shane, against the trustees of the Chicago, Rock Island & Pacific Railroad Company, to recover damages for the death of the said Edwin C. Shane on April 17, 1934, while employed by such trustees as a special agent or a special officer, as a result of alleged negligence and carelessness on the part of the defendants. From an adverse judgment in the sum of $5,000, the defendants appeal.

The suit is under the Federal Employers' Liability Act.

The plaintiff sues in her capacity of administratrix for the benefit of herself and the minor son of herself and the deceased.

The amended petition alleges that the deceased, Edwin C. Shane, was employed by the defendants in connection with the operation of an interstate train and that the defendants and the deceased were at the time of the injury to the deceased, from which he died, engaged and employed in carrying on interstate commerce.

It is conceded by the defendants that they and the deceased were engaged in interstate commerce at the time in question and that this action is governed by the Federal Employers' Liability Act.

The amended petition charges that, under the defendants' rules and generally established custom, the defendants and their servants owed to the deceased as one of its employees the duty (1) "to warn plaintiff's decedent when trespassers were observed, so plaintiff's decedent could protect himself against the violence of trespassers" and (2) "to refrain from cursing, abusing or aggravating trespassers and to refrain from threatening to strike them with clubs, flashlights or weapons."

The amended petition charges that the defendants negligently failed in both duties, as follows: ". . . defendants' agents, servants and employees negligently and carelessly failed to so warn plaintiff's decedent of the presence of said trespassers, and violated said custom and failed to exercise ordinary care for decedent's safety further by cursing said trespassers and precipitated a shooting affray by threatening to strike them with a flashlight and as a direct result thereof, under defendants' rules and custom and failure to exercise ordinary care as aforesaid referred to plaintiff's decedent was so injured as that he died shortly thereafter."

The amended petition further charges that "prior to his death as aforesaid the decedent was a well and healthy man twenty-seven (27) years of age, capable of and was earning a livelihood in the sum of approximately $175 per month; that he left surviving him plaintiff herein, his widow, and one son now five (5) years of age, Duane Shane, that because of the matters and things herein alleged said Vera and Duane Shane have been damaged in the sum of at least $50,000."

The plaintiff by her amended petition sought judgment against the defendants in the sum of $50,000.

The defendants' answer was a general denial and a plea of assumption of risk and a plea of contributory negligence.

The evidence shows that the deceased, Edwin C. Shane, was shot and killed in the railroad yards of the defendants at Bland, Missouri, while operating in connection with an interstate train of the defendants which had left St. Louis for Kansas City, Kansas, over their main line between such points, about 10:15 o'clock in the evening of the day upon which he was killed, by a negro named Willie Rowland. Rowland was one of a gang of negro merchandise thieves riding and operating on the defendants' night trains from St. Louis as far west as Bland, Missouri, over their said line.

The deceased was operating in connection with one Whitted, who was also operating under employment by the defendants as special agent. They were on the train in question under special orders for

the purpose of protecting merchandise shipments in transit thereon against theft.

The evidence shows that Rowland and four other negroes, with him at the time he shot and killed Shane, by prearrangement boarded the defendants' train at St. Louis and, soon after it left St. Louis, came upon a refrigerator car in the train near the front end thereof, containing merchandise, and broke the seals thereon over one of the hatch doors in the roof thereof and entered the car through such door and and stole a lot of merchandise therein; that each of the gang took a portion of the merchandise and Rowland put his in a grip which he was carrying and the others wrapped theirs into packages; that, as the train drew to a stop at the station at Bland, Missouri, they emerged from the inside of the car to the roof with the merchandise which they had stolen. So far as the evidence discloses, when the train stopped at Bland, Whitted was seen walking along the top of the cars in the train toward the front end thereof, approaching the refrigerator car from which the burglars had emerged with their stolen merchandise and upon the top of which they were at the time. Whitted appears to have been engaged, as he walked, in throwing a flashlight on the seals of the merchandise cars, ostensibly to discover whether or not they had been broken, while the deceased, Shane, was on the ground on the south side of the car as the train was moving west. At least, that is where his presence was first detected. Whitted encountered the gang of negroes with their merchandise. As he came up to them, he spoke to them and said, "Move over, boys." As he was coming up and while he was probably a car's distance away, Rowland had one of the other negroes hand him a pistol, which the other negro had on his person. Rowland held it in his hand under his coat. When Whitted came up after saying, "move over, boys," he cursed Rowland (who at the time was endeavoring to get his pistol in a position to shoot) and asked him what he had in his grip and, at the same time, threw back his flashlight and reached over to take hold of Rowland's grip, when he was immediately shot by Rowland and was killed and fell on the top of the car, where his body was afterward picked up by the trainmen, after the train stopped at Eldon. After being shot by Rowland, Whitted cried out, "Oh, I'm shot." After having shot Whitted, Rowland immediately started to climb down between the end of the refrigerator car on which he was and the car next thereto and was fired on by the deceased, Shane, who was standing near on the ground. While descending, Rowland shot and killed Shane, after Shane had first shot at him.

The only persons present at the killing were the five negroes and the two officers who were killed. The negroes were apprehended. Rowland was convicted and executed for murder. The other four pleaded guilty to theft and were sentenced to two years in the penitentiary. The only evidence obtainable as to the circumstances of the

shooting and killing was that given by two of the negroes, Willie Easley and James Goodrich.

It would appear that, for about two weeks prior to the shooting of Whitted and Shane, merchandise cars on the defendants' west-bound, night, freight trains out of St. Louis were being broken into and property was being stolen at some point between St. Louis and Eldon, Missouri, the first division point west of St. Louis. The seals were broken, upon both box cars with side doors and refrigerator cars with hatches or doors in the roofs; and the cars were entered through said doors; and the merchandise therein was stolen and taken therefrom. The deceased, Shane, had, in company with special agent Steele, also operating with the defendants' railroad and in its service, gone to Eldon on several occasions for the purpose of investigating car burglaries and thefts and discovering the thieves and had also, on occasions, accompanied other special agents upon the same errand.

It appears that it was a rule, or at least customary, for two special agents or officers to work together for the purpose of protecting merchandise and apprehending and catching car thieves (as Shane and Whitted were working) in instances where thieving from freight trains was known or suspected to be going on. Where two are thus working together, it is usual that one works on one side of a car and the other on the other side or one on one side and the other on the top. It is usual for them to confer at the end of each car; and each, at all times, is supposed to know where the other is.

On the night in question, Whitted and Shane were assigned by their superior officers in the department to the duty of riding the defendants' west-bound, night, freight train out of St. Louis for the purpose of protecting merchandise in the various cars in said train. They were met by the conductor of the train as it was about to leave St. Louis, whom they advised of their mission and advised that they would ride the train to take care of the seals and guard the merchandise. Shane said to him at the time, "And be careful as there might be something flying through the air." Shane and Whitted were of equal rank in the service; both had seen service for a number of years; and both were competent and efficient.

The plaintiff's evidence was directed to the duty special agent Whitted owed the deceased, Shane, under the circumstances, and the care required to be exercised by him for Shane's safety; and the theory of recovery submitted by the plaintiff's instructions was liability as for the negligence of Whitted. The office of the chief special officer of the defendants' railroad was in Kansas City. The special service department was, in effect, the police department of the railroad. It had charge of guarding and protecting freight houses, freight trains, and shipments of merchandise in transit.

As bearing upon the duty of Whitted to Shane on the issue of negligence raised by the petition, the plaintiff offered in evidence a

general safety rule of the defendants and the testimony of witnesses seeking to establish custom in respect to warning and the approach to and contact with trespassers on trains in cases where two officers were working together, riding a train and protecting and guarding merchandise and looking out for trespassers and thieves.

The defendants' safety rule introduced in evidence by the plaintiff reads: "The Company requires that every precaution shall be taken to prevent injury to its employees and others and prohibits their doing any work in any manner that will jeopardize their safety." It appears that the rule was applicable to the employees in the special officers department as well as employees in other departments.

On the issue of custom as to warning or starting trouble, there was testimony by two witnesses produced by the plaintiff—one an employee of the defendants in the special service department, M. D. Walker, and the other W. F. Finsch, who at one time had been employed as a railroad special officer. A number of special officers employed by the defendants testified as witnesses for the defendants.

The plaintiff's witness Finsch testified that, where two men were working together and one encountered trespassers on top of the train, it was the custom for him to notify the other man and that he could not say just how the warning would be given but that, under such circumstances, it should be given in a low voice so the trespassers would not be warned of the presence of the other man. He said he would try to give the warning and just in what manner he would give it would depend on the circumstances. The defendants' special agent Walker, called as a witness by the plaintiff, testified that whether or not one officer would warn the other when two were working together along or over a train depended on the circumstances. He said that each officer should know the location of the other to avoid cross fire between the two officers in case of shooting and that one officer might want to notify the other of running on to trespassers in case he wanted the other officer to help in catching or taking them into custody.

There was testimony that it was not usual for an officer meeting with trespassers unnecessarily to curse, threaten, or strike at them and again that it was the custom not to curse or strike at them. It appears that, about the time in question, hoboes in great numbers rode trains and that they, as well as car thieves, were frequently found in possession of bundles.

From the testimony of the plaintiff's two witnesses above referred to and the special officers produced by the defendants, it appears that the method of work of special officers (working together or singly) and their approach to trespassers in the protection of property and the apprehending of thieves depended on the circumstances of the particular case and that each officer was compelled to look out for himself, in the first instance, and meet emergencies in the manner

which seemed best at the time. The plaintiff's witness Walker testified that car thieves were known and regarded as dangerous and likely to be armed.

There is no direct evidence as to whether Whitted signalled or called to Shane, when he discovered Rowland and his confederates on the refrigerator car, and warned him of such fact. The two negro witnesses who testified to seeing Whitted approach merely testified that they did not hear him say anything to any one until he got to them. In fact, there is no evidence in the record to show that Whitted ever saw them until he got to them, while there is evidence tending to show that they never saw him until he was close upon them. The evidence is silent as to when or where he got upon the train or how long he had been walking thereon when their attention was called to him.

The defendants assign error upon the action of the trial court in refusing their requested instruction in the nature of a demurrer directing a verdict in their favor at the close of the whole evidence (1) because there was no substantial evidence of negligence on the part of Whitted in the respects charged in the amended petition, either in failing to warn or in starting an affray by cursing and threatening to strike Rowland or his co-trespassers; (2) because there was no substantial evidence that the death of the deceased was proximately caused by the negligence charged against the defendants in the amended petition; and (3) because the deceased assumed the risk of injury in the shooting affray so as to bar recovery, regardless of the questions of negligence and proximate cause.

The plaintiff's cause of action is based upon an alleged duty, by the defendants and their agents and employees under rule and custom owed to the plaintiff's decedent, Shane, to warn him of the presence of trespassers on the train when discovered and to refrain from cursing or threatening to strike trespassers and thereby start an affray; and it charges the breach of such duty in the negligent failure by defendants and their agents and employees to warn the plaintiff's decedent of the presence on such train of Rowland (by whom he was killed) and his co-trespassers and the failure to exercise ordinary care for decedent's safety in cursing said trespassers and precipitating a shooting affray by threatening to strike them with a flashlight, in which affray he was killed.

Since officer Whitted, whom Rowland (the negro car thief) killed before he killed the plaintiff's decedent (Shane), was the only employee of the defendants who was present or who was in a position to warn or who had otherwise anything to do with the matter, the charge depends on proof of negligence and failure to act with ordinary care by Whitted in the respects mentioned.

It became the duty of the plaintiff to show the duty which she claimed was breached, by some rule of the defendants, or to establish

a custom under the circumstances existing of his duty in such respects. The only rule of the defendants introduced in evidence is the following: "The Company requires that every precaution shall be taken to prevent injury to its employees and others and prohibits their doing any work in any manner that will jeopardize their safety."

Such rule lays down a rule of conduct governing employees in their work, requiring prudence and care on their part, to the end that the work done by each shall be done in a manner not to jeopardize a fellow worker.

The evidence tends to show that such rule applied to employees in the special service department out of which Whitted and Shane were both operating, as well as to employees in all other departments. It was in force at the time that Whitted and Shane were killed.

True, it makes no direct requirement of one employee to warn a fellow employee under any circumstances; but, nevertheless, a duty to warn might exist under such rule in a given situation existing where, in the exercise of prudence, warning should be given and where a failure to give it would constitute a lack of ordinary care for the safety of the fellow employee to his injury.

Whether, in any particular case, a duty to give warning arises necessarily depends upon the circumstances in the case and the situation created thereby.

There must be an opportunity to give it; it must be prudent under the circumstances to give it; and there must be some necessity for its giving or some useful purpose to be served by its giving. Thus, if a fellow worker is already fully apprised of a certain situation, there is no necessity for further notice. Whether or not it should be given depends upon a variety of circumstances.

In this case, it is not shown that Whitted had any opportunity to warn Shane after discovering the presence of Rowland and his co-trespassers and coming upon them, before he was shot. The evidence shows that he was suddenly confronted with an emergency and was shot immediately. He was entitled first to look after his own safety. There is no evidence to show that he knew of the presence of Rowland and his co-trespassers until he suddenly came upon them. There is no evidence to show that he saw them at a distance in time to have called to Shane before he was shot. If, after he came upon them, he had called to Shane, it would have been but to have attracted the attion of Rowland to Shane and to have made Shane's position more dangerous. It cannot be said that he was under any duty to Shane to increase Shane's hazard. Neither can it be said that he was under any duty to Shane, the violation of which would amount to negligence or lack of ordinary care, where no opportunity existed for giving him warning except at the expense of his own safety and life. The evidence fails to show that he had any other opportunity. The evidence

tends to show that, as he approached the car where Rowland and his confederates were, it was dark and that he came along, throwing his flashlight on the cars to see whether the seals on the doors thereon had been broken, and came upon Rowland suddenly, when he went into immediate engagement with him and was killed by Rowland.

Furthermore, from the evidence, it appears that Shane was fully aware of the presence of Rowland and his confederates upon the train at the time that Whitted came upon him. He was himself, immediately after the gunshot which killed Whitted, shooting at Rowland as Rowland was attempting to start down from the car. It was only a moment between the time Whitted discovered and came upon Rowland and the time that he was shot and only a moment thereafter until Rowland started descending from the car and was shot at by Shane. Shane must have known of Rowland's presence on the car at the same time that Whitted learned of it. He was working in connection with Whitted. Whitted was on the top of the train; and he was at the side on the ground, standing at a sufficient distance therefrom to see Rowland and his confederates on the top of the refrigerator car, which was only about thirteen feet from the ground. His body was found where he fell, about four feet from where the train stood. Whitted and Shane were supposed to keep track of each other's positions and to watch out for each other and to be in a position to help each other. It was testified to by the witness Goodrich (one of Rowland's confederates on top of the refrigerator car with Rowland) that he saw Shane standing on the ground at the side of the car pointing his gun upward at Rowland at the time that Whitted cursed Rowland. True, he said Shane was on the right side of the car as it was headed west when all of the other evidence is to the contrary—that Shane was on the left side of the car. However, such statement, whether intentionally or otherwise made, does not destroy his evidence that he saw him at that time with his gun pointed upward toward Rowland. Whether Shane's attention had been previously called to the presence of Rowland and his confederates by Whitted does not appear.

Moreover, had it been required of Whitted under the circumstances surrounding him that he should have given warning to Shane in some manner, it is not shown by the evidence that he did not comply with such requirement. The burden was upon the plaintiff to show that he failed to give such warning. This she did not do by any substantial evidence. The witnesses upon whose testimony the plaintiff relies merely testified that they saw Whitted as he approached Rowland, walking along and throwing his flashlight on the cars and the seals on the doors or hatches thereto. They testified that, after their attention was attracted to him, they did not hear him say anything to anybody. They did not show by their testimony whether he ever

saw them or appeared to see them until he came upon them and told them to move over. He may have signalled to Shane, and they not have known what he was doing. He may have called to Shane, and they not have heard him. Especially is this true when evidence to the effect that, in giving warning where the trespassers might ordinarily hear, it was usual to give it in such a low tone of voice that they might not hear it is considered. The negative testimony of the negro witnesses, that they did not hear Whitted say anything to anybody, is without probative force in establishing that Whitted did not warn Shane. He may have warned Shane before they saw him. There is no evidence to show when or where he got on the train or how long he had been walking thereon before they saw him. Anyhow, whether he warned Shane or not, Shane appears to have had full notice. Under such circumstances, it was unnecessary that Whitted should have warned him. [Boehmer v. Pa. R. Co., 252 Fed. 553; Atchison, T. & S. F. R. Co. v. Wyer, 8 Fed. (2d) 30; Hirsch v. Freund Bros. Bread Co., 150 Mo. App. 162, 129 S. W. 1060; Southern Pac. Co. v. Stevenson (Tex.), 218 S. W. 151.]

Nor do we think there was any substantial evidence of a custom establishing any duty on the part of Whitted either to warn the deceased Shane or to refrain from cursing or threatening to strike a trespasser when he met one.

One of the plaintiff's witnesses, Finsch, an ex-service man, testified that, when two officers were working together and one saw a trespasser, it was customary for him to notify the other. He testified, however, that he could not say how the notice should be given in any particular case and stated that it should be given in a low tone so as not to warn the trespasser as to the presence of the fellow officer. The plaintiff's other witness, the defendants' special officer Walker, testified that the manner of warning a fellow officer depended upon the circumstances of the particular case.

As to the alleged custom of not cursing or threatening to strike trespassers, except for the testimony of witness Finsch, the evidence was merely that it was not the custom to start trouble unnecessarily. Finsch said it was the custom not to do so.

As bearing upon the existence of either alleged custom, it appears from the testimony of all witnesses—the two produced by the plaintiff as well as those produced by the defendants—that it was customary for two men to work together to protect property in trains and to apprehend car thieves and, in working in that way as well as singly, special officers were each, customarily and necessarily, primarily concerned with looking out for themselves and that there was no fixed rule of conduct or practice but every situation had to be met as circumstances demanded.

Like all other questions of fact, a custom must be proved by evidence, which, if proved, is enough to put it beyond mere conjecture and

into the realm of reality. Proofs of a custom can not be said to be sufficient to submit that issue to the jury unless there is substantial evidence to show that what is claimed to be custom amounts to a definite, uniform, and known practice under certain definite and uniform circumstances. [McClellan v. Pa. R. Co. (C. C. A. 2), 62 Fed. (2d) 61; Chicago, M. & S. P. R. Co. v. Lindeman (C. C. A.), 143 Fed. 946; Wabash R. Co. v. Kithcart, 149 Fed. 108.]

The evidence in this case of that which is sought to be established as custom does not meet such requirement.

It does not show any fixed rule of conduct or practice under definite and uniform circumstances. Upon the other hand, it demonstrates the improbability, if not the impossibility, of any custom growing up establishing any fixed rule of conduct or practice applicable to the situation presented in the case at bar.

The very nature of the work these two officers were doing—patrolling the train to protect the train and shipments of merchandise against expected theft, to discover car thefts, and to apprehend and catch the thieves—would negative the possibility of any custom fixing any precise or particular line of conduct.

The inherent improbability that any custom, either as to warning or as to not cursing or striking trespassers, could have grown up and become applicable to any such situation as that presented in the case at bar compels the conclusion that Whitted owed Shane no duty either to warn him of the presence of the trespassers or to refrain from cursing or striking at one of them.

Speaking of a similar "inherent improbability of the existence of a custom," the court said in McClellan v. Pennsylvania R. Co., supra, l. c. 64 and 65 Fed. (2d):

". . . The inherent improbability that such a custom could have grown up either outside the rules or in conflict with them makes the solution of this question of custom not alone the determination of the credibility of one set of witnesses in respect to that of another giving conflicting testimony. It makes the evidence on this issue so overwhelming in favor of the defendant that the trial court was justified in directing the verdict. No jury could have reached any other conclusion upon a reasonable and impartial analysis of the evidence. [Small Co. v. Lamborn & Co., supra; Southern Pacific Co. v. Seley, supra; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Southern Ry. Co. v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239; Baltimore & Ohio R. R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; Biermacki v. Penn. R. R. Co. (C. C. A.), 45 F. (2d) 677.]"

The plaintiff failed to show by any substantial evidence that the defendants or their agent, Whitted, was under the duty to the deceased, Shane, as alleged in the amended petition, either under any rule of the defendants or under the custom alleged in the amended

petition, and therefore failed to show any act of negligence on the part of the defendants or their employee, Whitted, as charged in the amended petition.

The defendants' instruction in the nature of a demurrer at the close of the whole evidence should have been given. It was erroneously refused, and the case was erroneously submitted to the jury.

It is unnecessary to consider any of the other points raised.

The judgment is reversed. All concur.