BROADVIEW LEASING COMPANY et al., Plaintiffs-Appellants,

v.

CAPE CENTRAL AIRWAYS, INC. and City of Cape Girardeau, Missouri, Defendants-Respondents.

No. 36935.

Missouri Court of Appeals,
St. Louis District,
Division Three.

May 4, 1976.

Motion for Rehearing or Transfer
Denied June 15, 1976.

Application to Transfer Denied
Sept. 13, 1976.

Oliver, Oliver & Jones, James F. Waltz, Cape Girardeau, Morrison, Hecker, Curtis, Kuder & Parrish, Byron J. Beck and Lex A. Passman, Kansas City, for plaintiffs-appellants.

Jackson, Thomasson, Dickerson & Gilbert, Donald P. Thomasson, Finch, Knehans, Cochrane, Bradshaw & Strom, Richard G. Steele, Cape Girardeau, for defendants-respondents.

SIMEONE, Presiding Judge.

This is an appeal by three plaintiffs-appellants—Broadview Leasing Company, National Enterprises, Inc. and Astro Rentals, Inc.—from a judgment entered by the Circuit Court of Cape Girardeau County on January 24, 1975, in favor of the defendants Cape Central Airways Inc. and the City of Cape Girardeau.[1] The appellants raise three points urging this court to enter judgment in their favor or in the alternative to reverse and remand the cause for a new trial. For reasons hereinafter stated, we affirm.

## I

### The Facts

This cause is, in essence, a suit by three plaintiffs as bailors to recover damages against the bailee, Cape Central Airways, for the loss of certain aircraft and equipment which was in the possession of Cape Central and which was destroyed by fire in Hangar No. 1 located at the Cape Girardeau airport.

Each of the three plaintiffs pleaded in three counts,[2] which can be described as (1) general negligence, (2) a contract of bail-

---

1. On August 7, 1975, the plaintiffs-appellants dismissed their appeals as to the defendant City of Cape Girardeau; hence, this appeal is from the judgment in favor of Cape Central Airways, Inc. only.

2. The petition of each plaintiff was in three counts:

   Count I pleaded that the aircraft or equipment was delivered to and "stored" by Cape Central, that the hangar was under the "exclusive care, custody and control" of the defendants and that the defendants "so negligently operated and cared for said hangar and airport facility" that plaintiffs' aircraft or equipment was completely destroyed.

   Count II alleged that the property was delivered to and stored by the defendants, that the

"aircraft" or "equipment" was in the "exclusive care, possession, custody and control of the defendants," and while in the "exclusive care, custody and control of the defendants" the aircraft and equipment was "totally destroyed by fire to plaintiffs' damage . . . ."

   Count III alleged that defendant was a bailee for hire and that as such bailee, it failed to "exercise that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances" in certain alleged respects.

   At the close of the plaintiffs' case, the trial court on motion struck the first count as to each plaintiff "on the basis that those counts pertain to *res ipsa loquitur* theory."

ment, and (3) specific negligence. Cape Central in its answer denied the pertinent allegations of the petition. On the day preceding the trial, Cape Central by leave amended its answer by adding the defense of " '. . . act of God, to-wit, lightning, and not by any negligence on the part of this defendant.' " The case was submitted on a bailment theory that, if the jury believed that the property was stored by the defendant for a price and while in the possession of defendant the property was destroyed and could not be returned, verdict must be for plaintiffs unless it found under other instructions that Cape Central exercised ordinary care.

The facts of the case are quite voluminous. The City of Cape Girardeau, a municipal corporation, owned and controlled a municipal airport which included taxiways, buildings and hangars. Cape Central Airways, Inc. had been operating the airport since 1950. On June 1, 1967, the City entered into two agreements with Cape Central. One was an "Airport Manager's Agreement," and the other was a "Fixed-Base Operator's Contract." The manager's agreement provided that the City desired to employ Cape Central for a period of ten years and designated Cape Central as the "manager" of the airport. Mr. John T. Seesing was designated as the first manager. Under the agreement, Cape Central had varied and sundry duties. For its services Cape Central was to receive a certain compensation.

The fixed base operator's contract [3] provided, inter alia, that the City lease to Cape Central certain buildings, including three hangars. "All of the wooden buildings, including the hangars, are leased hereunder subject to the right of [the City] to demolish any one of them should any one of them become unsafe or unfit . . . ." Under this agreement, Cape Central agreed to pay the City a certain sum per month and was required to perform certain services at the airport including " . . . storage for

airplanes or aircraft in hangars or in other buildings."

One of the plaintiffs, Broadview Leasing, was the owner of a 1971 Cessna 310 aircraft valued at $90,000.00 which had just been purchased a month before from Cape Central. On July 15, 1971, the day the fire occurred, the aircraft was in Hangar No. 1, an old wooden hangar constructed during World War II, for the purpose of installing additional avionics equipment in the plane. The aircraft was normally housed in a metal hangar west of the wooden hangar but, on July 15, 1971, was in Hangar No. 1 for such purpose.

National Enterprises was the owner of a 1968 Piper Cherokee Arrow valued at approximately $17,000.00. This aircraft was stored in the hangar on July 15, 1971, for a fee.

Astro Rentals, Inc. was the owner of certain aircraft equipment—a King Model DME (Distance Measuring Equipment) valued at $1755.00, which was also destroyed in the fire.

The tragic event which destroyed the two aircraft and equipment took place in the early morning hours of July 15, 1971. On that date, Mr. Ralph R. Schnurbusch, Jr., employed by Cape Central as night watchman and line service attendant, was on duty at the airport. The night was a stormy and rainy one—"it was storming and raining and lightning and the wind was blowing, just like a regular thunderstorm we had had out there a few times before." There was "quite a bit of lightning." "Ray" Schnurbusch was at the south end of the terminal building at about 4:15 or 4:20 a. m. when he "heard a bolt of lightning and it sounded like it struck something . . . ." It was "real close." When he looked outside, ". . . I seen a glow on the top of the hangar . . . so I ran out there." He ran to Hangar No. 1. That hangar was the one normally used by Cape

---

3. Mr. Seesing described a fixed base operator: "A fixed base operator deals in aircraft sales, aircraft service, flight instruction, aircraft rental, charter business, sale of fuel, storage of aircraft and practically all areas of aviation, except operating an airline." The operator also leases certain buildings and space and ". . . we were managers of the airport for the City."

Central to maintain and work on aircraft. When Mr. Schnurbusch got to the hangar, there "was a couple of pieces of wood that were laying on the ground that had been knocked out of the top of the hangar . . and they were burning on the ground . . . ." The hangar was "about 20 to 24 feet high and a couple hundred feet long . . . ." He saw a fire at the top of the hangar. He "[g]rabbed the hose and tried to put the fire out." The hose was a "½ to ¾ inch water hose"—a "regular green garden hose used to wash airplanes and stuff with, and cars." In a few seconds, however, the "stuff started falling in from the top." Ray Schnurbusch saw that he wasn't going to be able to control the fire, so he ran to call the fire department in the terminal building, but the phone was "dead." Ray then "ran down to the FAA man [John Sarff] and asked him to call the Fire Department . . . ." He then went back to the hangar. By this time the fire had "grown quite a bit" and "the planes were burning and shortly after the planes started exploding." The fire department received the call at about 4:35 a. m. Captain Calvin Lee Lynch proceeded to the airport with three units but had a difficult time getting there because the rain was so hard that "[w]e couldn't see where we were going." When one of the fire trucks reached the airport, it got "stuck" in the ditch. By then, the fire was raging beyond control, so the firemen created a "water curtain" to save other buildings.

As a part of the plaintiffs' case, plaintiffs read portions of several depositions and answers to interrogatories. From this evidence it was brought out that there had been, prior to July 15, 1971, two previous fires, one in 1956 which destroyed the administration building, and one on July 15, 1966, which completely destroyed another wooden hangar, Hangar No. 3, which was "[p]robably caused by lightning." After the 1966 fire, the matter of fire protection at the airport was discussed by various officials including Mr. Seesing, the airport board, the fire chief and the city manager. In 1970, for example, the Board discussed the lack of a fire truck at the airport. Fire

Chief Carl Lewis, Mr. Seesing and perhaps others recognized the problem of fire protection at the airport, and the matter was discussed with the city manager by Chief Lewis and Mr. Seesing. As a result of these discussions, after the 1966 fire, a fire truck was purchased from Oak Ridge, which in the opinion of the Chief "wasn't suited for our type of fire protection and it needed maintenance; it was in bad shape." "It looked like a dog to me." It was not equipped to fight hangar fires and was not operable for the purpose of fighting a roof fire. Neither was the truck manned properly. When the truck was attempted to be started the day after the fire, it would not start. After the 1966 fire, in addition to the truck, two chemical wheeled fire extinguishers and at least two hand extinguishers were purchased for use at the airport. The chief and Mr. Seesing discussed the problem of adequate protection, but as explained by the city manager at the time of trial, a decision was made, because of economics, priorities and financing, not to construct a fire station manned on a 24-hour basis at the airport.

A bond issue had been sought in 1964, which included $50,000 for fire-fighting equipment, but it failed to pass.

During the trial, the former fire chief of the City, Carl Lewis, testified. He stated that he was chief at the time of the hangar fire. On July 15, 1971, he received the call concerning the fire at the airport. When he arrived at the hangar, it was "all burned up." When he arrived, three fire units were present, but one was in the ditch. When he arrived, it was "too late; there was nothing left worth saving." He stated that Hangar No. 1 had no sprinkler system, no usable fire hydrants, and no fire prevention materials. There were no lightning rods on the hangar; there were no fire retardant properties, and the hangar was "[t]inder dry." In short, the chief indicated that, as a practical matter, the "airport was pretty much without any kind of fire protection . . . ."

Mr. Seesing also testified at trial. He stated that he and Mr. John Godwin were

the officers of Cape Central, that Cape Central was the fixed base operator at the airport and it leased certain buildings. The basic thrust of his testimony was that he was familiar with other fixed base operations and airports in "this part of the country," and he had visited many communities in Missouri and elsewhere where they have fixed base operations and had occasion to observe the fire-fighting equipment at these operations. Plaintiffs objected to this evidence on several grounds including that it was irrelevant, that it was not the "standard to be utilized in establishing some duty on the part of Cape Central," and that no proper foundation was laid. Over the continuing objections of the plaintiffs, Mr. Seesing was permitted to testify that in some cities there were wooden hangars, in some there were hangars built of wood and covered with metal, and in some there were hangars of masonry or metal. Over objection, he was permitted to testify that none of them had a sprinkler system, lightning rods, fire trucks, trained firemen, or fire-fighting units with trained men stationed at the fixed base operation, and that the hangars were used some for maintenance and some for storage. He did not know how far the fire departments were from the other airports.

He further testified that he had discussions with the city manager about better fire-fighting facilities and a better water system, but that the only things that were accomplished were the obtaining of the fire-truck, the 400-pound chemical extinguishers and the hand extinguishers.

Mr. John E. Godwin, Jr., an officer of Cape Central with Mr. Seesing, also had discussed with the City the need to improve the fire-fighting equipment at the airport not only for the aircraft but for the wooden facilities. The City was "very sympathetic," but "they didn't come up with a way to provide the money . . . ."

Two other witnesses corroborated much of Mr. Seesing's testimony concerning the conditions at other airports in the area. One was Mr. Charles Gene Siebert, the director of airport operations for Southern Illinois University and a fixed base operator. He testified that the buildings at Southern Illinois were constructed of brick and masonry, five hangars were steel, and that the fire equipment was basically the same as in most airports. The buildings had no sprinkler systems. He further stated he was familiar with several municipal airports in the area and that several cities had wooden hangars,[4] but none of the facilities had lightning rods or sprinkler systems.

The other witness was Mr. Bernard J. Coogan, an aviation safety consultant, director of safety for the Missouri Air National Guard and formerly a fixed base operator. He testified that he surveyed about thirty fixed base operations and that "about half of the operators I have looked at use wooden buildings." None had lightning protection on any building of that type, or sprinkler systems. He did indicate on cross-examination that the Air Force does use lightning rods in munition storage areas.

In rebuttal, Professor Benjamin Francis Abel, a professor of Aeronautics and Meteorology at Parks College, testified. He inspected the Cape Girardeau airport in 1974 and made a study as to the likelihood of lightning strikes at the airport due to the terrain. He reported that a series of lightning rods attached with a heavy-duty cable to the ground would minimize the risk of lightning. But on cross-examination, he stated that there were wooden hangars at Parks used for storage and for classroom facilities but not as airplane hangars, which did not have rods.

At the close of the evidence, the plaintiffs moved for directed verdicts on the grounds that (1) Cape Central was a warehouseman within the meaning of the Uniform Commercial Code, (2) the aircraft and equipment was stored with Cape Central and was in its exclusive care, custody and control, (3) Cape Central failed to plead or prove any affirmative defense showing that it exercised due care and (4) Cape Central failed to

4. Festus, Pinkneyville, Ill., Waterloo, Ill., Chester and Perryville.

sustain its burden of proving that it exercised due care. This motion, however, was overruled.

The court instructed the jury and gave the plaintiffs' verdict directors.[5] The court also gave Instruction No. 6, dealing with due care on the part of Cape Central,[6] and, in another instruction, defined ordinary care as ". . . that degree of care that an ordinary, careful and prudent person would use under the same or similar circumstances." The plaintiffs offered instructions A, B and C relating to the respective plaintiffs, but the offers were refused.[7]

After arguments, the jury returned a verdict in favor of the defendant, Cape Central, and judgment was entered accordingly.

The plaintiffs, after trial, filed a motion for judgment "notwithstanding the verdict" or in the alternative for a new trial, which was overruled.

## II

### The Contentions on Appeal

On this appeal, plaintiffs contend that the trial court erred in (1) failing to sustain their motion for judgment "notwithstanding the verdict" for the reason that Cape Central failed to sustain its "burden of pleading and proving its exercise of ordi-

nary care"; (2) failing to sustain the motion for new trial because the court erred in permitting the testimony of Messrs. Seesing, Siebert and Coogan "regarding their observations of the lack of fire-fighting or lightning-arresting equipment in other localities for lack of foundation"; and (3) failing to sustain the motion for new trial because the trial court erred (a) in submitting Instruction No. 6 and (b) in refusing to submit plaintiffs' requested Instructions A, B and C because (1) Cape Central never pleaded an affirmative defense of due care, (2) the instruction [Instruction No. 6] constituted a roving commission and injected a false issue, (3) the instruction was "in the nature of a Sole Cause instruction," and (4) it improperly placed the "burden of proof" on plaintiffs.

As to their first point, appellants in their argument portion of their briefs contend that the motion for judgment n. o. v. should have been sustained because Cape Central failed to meet its "burden as a bailee and warehouseman" within the meaning of the Uniform Commercial Code and under the common law to "plead and prove" that it exercised due care after plaintiffs proved delivery, acceptance, control and destruction. They argue that the Uniform Warehouse Receipts Act, which was repealed by our General Assembly, places the burden of

5. Instructions 3, 4 and 5 were basically the same, differing only as to a particular plaintiff. Instruction No. 3 read as follows:

"Your verdict must be for plaintiff, Broadview Leasing Company and against defendant, Cape Central Airways, Inc., if you believe:

First, plaintiff was the owner of a 1971 Cessna 310 aircraft, and

Second, the 1971 Cessna 310 was stored by defendant for an agreed price, and

Third, while the Cessna 310 was in the possession of the defendant, it was destroyed, and

Fourth, the Cessna 310 could not be returned to plaintiff.

Unless you believe that plaintiff is not entitled to recover by reason of Instruction No. 6. Not in MAI."

6. Instruction No. 6:

"Your verdict must be for defendant Cape Central Airways, Inc. on the claims of all plaintiffs for damages, if you believe:

First, that defendant Cape Central Airways, Inc., used ordinary care for the protection of plaintiffs' property while that property was in the possession of defendant Cape Central Airways, Inc., or;

Second, plaintiffs' damages were not a direct result of the failure of defendant Cape Central Airways, Inc. to use ordinary care. Not in MAI."

7. Instruction No. C:

"Your verdict must be for plaintiff, Broadway Leasing Company, and against defendant, Cape Central Airways, Inc., if you believe:

First, plaintiff was the owner of a 1971 Cessna 310 aircraft, and

Second, the 1971 Cessna 310 was stored by defendant for an agreed price, and

Third, while the Cessna 310 was in the possession of the defendant, it was destroyed, and

Fourth, the Cessna 310 could not be returned to plaintiff."

proof on the warehouseman to "establish the existence of a lawful excuse" and that this burden is carried over into the Uniform Commercial Code (§ 400.7–204, RSMo 1969), which restates the Missouri bailment law. There is much common sense, they say, in placing the "burden of proof" on the bailee, because the bailor is unaware of any factual circumstances which attend the loss of the property while in the care and control of the bailee, and it is reasonable to cause the bailee to bear the "risk of nonpersuasion." Hence, they say they are entitled to a directed verdict against the defendant. Plaintiffs contend that the "burden of proof" is upon Cape Central to show that it exercised due care and that Cape Central failed to meet its burden of proving due care because the equipment obtained after the 1966 fire was insufficient to protect against the hangar fire, that the testimony of Cape Central's witnesses as to what was done in other communities does not show or establish the standard of care required of Cape Central at this airport and because even if others were negligent, this does not excuse the alleged negligence of Cape Central. Finally, they contend that evidence of what others may have done does not constitute a "custom or practice" to show the standard of care required of Cape Central.

In their second point, plaintiffs argue that Cape Central failed to lay a sufficient foundation showing "uniformity of circumstances and conditions at fixed-base operations" located in other cities. There was no evidence they say to show uniformity of conditions relating to the history of lightning strikes or history of fires or that the buildings at other locations were fire hazards or the availability of fire-fighting equipment at these other locations.

As to its third point, plaintiffs argue that Cape Central never pleaded an affirmative

defense under Rule 55.08 of "due care"; hence, submitting Instruction No. 6 was error. Further, Instruction No. 6 injected a false issue of "causation" and put the burden of proof on the plaintiffs.

We will attempt to answer each of these points and arguments in turn.

### III

### *Judgment in Accordance With Plaintiffs' Motion for Directed Verdicts*

This valuable property was delivered to, stored by and while in the possession of Cape Central, was destroyed so that it could not be returned to the owners. Hence, the plaintiffs argue that once they have proved delivery, acceptance, possession by the bailee and destruction, the "burden of proof" shifts to the defendant, Cape Central, to show due care, and in the absence of proving due care a directed verdict must be given to the plaintiffs. They contend that Cape Central failed to meet its "burden" as a bailee and "warehouseman" to plead and prove due care and contend that the evidence in other communities was not admissible evidence of custom and practice permitting a finding that Cape Central exercised ordinary care.

This case was tried and submitted not on the theory of the bailee's obligations under the Uniform Warehouse Receipts Act [8] which has been carried over into the Uniform Commercial Code,[9] but on the theory of bailment of property which was destroyed while in the exclusive care and custody of the bailee, Cape Central. This case presents a bailment situation and not a "warehouse receipts" case. We believe the argument of appellants relating to "warehouse receipts" is misplaced.

■ Since this is a bailment case, it must first be determined which party has the

---

8. § 406.090, RSMo 1959, repealed, Laws 1963 at p. 637, effective July 1, 1965; *Gutknecht v. Wagner Bros. Moving & Storage Co.,* 266 S.W.2d 19 (Mo.App.1954), is not under these circumstances controlling.

In view of the definition of "bailee" and "warehouseman" in § 400.7–102(1)(a), it is difficult to conclude that Cape Central is gov-

erned by the provisions of U.C.C. "Bailee" is defined as the "person who by a warehouse receipt . . . acknowledges possession of goods and contracts to deliver them."

9. §§ 400.7–204 and 400.7–403; 3 Anderson, *Uniform Commercial Code,* § 7–403:5, p. 609 (1971).

"burden of proof." The whole question of which party bears the "burden of proof" in a bailment situation has not been clearly and definitively articulated in this state. The question hinges upon whether the action is one of negligence or one of contract. The terms "burden of proof" and burden of "going forward with the evidence" are, of course, quite distinct.[10] The "burden of proof" may differ depending upon the pleadings and the theory of the action. At least three theories may be asserted by the bailor—general negligence, breach of the bailment contract and specific negligence. It is clear in this state that by alleging general negligence on the part of the bailee, the bailor, upon proof of loss, raises an inference [11] of negligence under the res ipsa loquitur doctrine and thus shifts the burden of going forward with the evidence to the bailee,[12] but the burden of proof rests with the bailor. Under this theory, the bailor makes a prima facie case shifting to the bailee the burden of going forward with the evidence to rebut the inference of. negligence. *Bommer v. Stedelin,* supra, 237 S.W.2d at 227.

Plaintiffs, however, urge upon us the doctrine that the "burden of proof" is upon the bailee. They rely on decisions from South Carolina and Idaho—*Fortner v. Carnes,* 258 S.C. 455, 189 S.E.2d 24 (1972); *Fleischman, Morris & Co. v. Southern Ry.,* 76 S.C. 237, 56 S.E. 974 (1907); and *Low v. Park Price Company,* 95 Idaho 91, 503 P.2d 291 (1972). *Fortner,* supra, recognizes the "somewhat exceptional rule" in that state that the "burden of proof" is on the bailee to show the precautions taken to prevent the loss or injury and not merely the isolated fact of

loss or destruction. *Fortner,* however, does not clearly indicate whether the action is one of general negligence or in the contract of bailment. *Low,* supra, however, allocates the "burden of proving" care on the bailee and the allocation is not affected by the presence of allegations of negligence. *Low* extends *Fortner* to place the burden of proof on the bailee in a negligence case. *Low* recognizes that this holding is a minority position.

Missouri has not adopted the position laid down in these authorities that in a general negligence situation the burden of proof is on the bailee. Where general negligence is relied upon, the burden of going forward with the evidence is on the bailee, but the burden of proof remains on the bailor.

But while the principles relating to general negligence seem to be well settled, "[s]ome confusion appears to have arisen regarding which party carries the burden of proof when the bailor's action is bottomed on a breach of the contract of bailment, rather than on negligence. . . ." *Nuell v. Forty-North Corporation,* supra, 358 S.W.2d at 76. In Missouri:

". . . The correct rule seems to be that if the bailor merely pleads the bailee's breach of the contract by failure to redeliver, and does not allege want of due care or of negligence on the part of the bailee, the burden of proof is on the bailee to excuse or explain his failure to return the property." [13]

See also *Crow Contracting Corp. v. George F. Smith Co.,* 407 S.W.2d 593, 597 (Mo.App. 1966) [14]; *Revenue Aero Club v. Alexandria Airport,* 192 Va. 231, 234, 64 S.E.2d 671, 673 (1951).

---

**10.** See 8 Am.Jur.2d, Bailments, § 306 (1963); Annot., 44 A.L.R.3d 171, 176 (1972); Brown, Personal Property, supra, § 87, pp. 359–375.

**11.** Some decisions use the term "presumption"—*Weinberg v. Wayco Petroleum Company,* 402 S.W.2d 597, 598 (Mo.App.1966).

**12.** See *Weinberg v. Wayco Petroleum Company,* supra; *Bommer v. Stedelin,* 237 S.W.2d 225, 227 (Mo.App.1951); *Nuell v. Forty-North Corporation,* 358 S.W.2d 70, 76 (Mo.App.1962).

**13.** *Nuell,* supra, relied upon the decisions of *E. O. Stanard Milling Co. v. White Line Cent. Transit Co.,* 122 Mo. 258, 26 S.W. 704 (1894), and *Freeman v. Foreman,* 141 Mo.App. 359, 125 S.W. 524 (1910). *Stanard* was a common carrier case in which there is a higher standard of care than on a bailee. Cf. *American Brewing Co. v. Talbot,* 141 Mo. 674, 42 S.W. 679 (1897), and *Hoerath v. Sloan's Moving & Storage Co.,* 305 S.W.2d 418, 420 (Mo.1957).

**14.** Some cases take the position that regardless of the theory on which the action is brought, the burden is on the bailor. *Wyatt v. Baugh-*

From the record and from the implicit argument in the briefs of the appellants, we conclude that the appellants contend that since this was a breach of contract of bailment and not a general negligence situation, the "burden of proof" rested upon the bailee, Cape Central, to plead and prove its exercise of ordinary care, and since they contend the defendant did not, they are entitled to judgment as a matter of law.[15]

We believe the more modern rule is as stated in 8 Am.Jur.2d, Bailments, § 311, pp. 1196–1197 (1963):

"Where the bailor relies upon the contract of bailment, . . . the burden of proof to establish a breach of duty, which rests on the plaintiff throughout the trial, is merely the burden of showing the bailee's failure to perform his contract to return the property. In such case the bailee is liable under his contract unless he offers a lawful excuse for his failure to perform, and where he seeks to excuse his failure to redeliver on the ground that the property was lost, destroyed, or taken out of his possession without his fault or negligence, he offers an affirmative defense, and the burden rests upon him to establish, upon the whole case, that notwithstanding the loss of the property, he exercised the proper degree of care which the law requires of bailees similarly situated . . . ."

█ We believe that in a bailment case, where the theory of the bailor's action is based on breach of contract, the burden of proof lies with the bailee to plead and prove due care on its part. Based on this theory, still we are convinced that there was no error in this case. We hold that the burden of proof was upon the bailee, Cape Central, and that it introduced the issue of due care and introduced sufficient substantial evidence for the jury to determine that it did exercise due care under all the circumstances.

█ Cape Central amended its answer with leave of court, that plaintiffs' damages, if any, were caused by "an act of God and not by any negligence on the part of this defendant." Permission to amend pleadings lies in the sound discretion of the trial court. *DeArmon v. City of St. Louis*, 525 S.W.2d 795, 802 (Mo.App.1975). This amendment was sufficient, in our opinion, to raise the issue of whether Cape Central exercised due care. And evidence was introduced, not only to show the cause of the loss,[16] but to show the efforts made to save

man, 121 Utah 98, 239 P.2d 193, 195–196 (1951); *Agricultural Ins. Co. v. Constantine*, 144 Ohio St. 275, 58 N.E.2d 658, 663 (1944) (collecting cases). Others take the position that when brought in tort or contract, burden of proof to show the exercise of due care is on the bailee. *Knowles v. Gilchrist*, 362 Mass. 642, 289 N.E.2d 879, 885 (1972).

15. From the brief filed by the plaintiffs-appellants, it is difficult to discern whether plaintiffs are contending that Cape Central has the "burden of proof" because the theory of plaintiffs' action is one of negligence under the res ipsa doctrine or whether they are contending that Cape Central has the burden because the theory of plaintiffs' pleadings was one of breach of contract of bailment. The authorities relied upon in the brief, *Fortner, Fleischman* and *Park-Price*, supra, are cases involving the negligence theory, rather than breach of contract of bailment, and the courts of these states frankly hold that the "burden of proof" as to due care is upon the bailee rather than the bailor. These authorities do not comport with the traditional rule in Missouri that the "burden of proof"

never shifts from the bailor. Cf. *McCloskey v. Koplar*, 329 Mo. 527, 46 S.W.2d 557, 562, 92 A.L.R. 641 (banc 1932). However, appellants in their brief suggest that "in an action such as *this*" [bailment contract?], the burden of proof is on the bailee, Cape Central. Since the transcript reveals that the res ipsa counts were dismissed by the trial court, the only theories remaining were the breach of contract of bailment counts and the specific negligence counts. Hence, the appellants seem to be urging from the tenor of their brief that where the action is on a breach of bailment contract the burden of proof shifts to the bailee to prove due care.

16. In *Fortner v. Carnes*, supra, relied upon by the plaintiffs, the court held that the burden on the bailee is not merely to show the isolated fact of destruction, but the bailee must show the circumstances connected with the loss or injury as far as is known by the bailee and the precautions taken to prevent the loss or injury. When such facts are shown, it is then for the jury to say whether the bailee was negligent.

the hangar, to put out the fire, to obtain better fire protection, to show substantially similar conditions in other communities, and to show that the fire protection afforded at the airport was similar to other parts of the city. There was sufficient substantial evidence introduced to make a submissible case on due care. The plaintiffs did not object to much of the evidence of Cape Central except that relating to the custom and practice in other communities. Furthermore, Instruction No. 6 properly placed the "burden of proof" of due care upon Cape Central by informing the jury that "if you believe" that Cape Central exercised "ordinary care" its verdict must be for the defendant.

## IV

### Custom and Usage

However, plaintiffs further contend that the evidence presented by Cape Central as to the custom and practice in other communities did not constitute "substantial evidence" which would permit a finding that Cape Central exercised "due care". Plaintiffs rely on *Davis v. Gatewood*, 299 S.W.2d 504 (Mo.1957). There, our Supreme Court stated:

". . . In order to prove custom the evidence must show a definite, uniform and known practice under certain definite and uniform circumstances. . . .

. . . 'Proofs of a custom cannot be said to be sufficient to submit that issue to the jury unless there is substantial evidence to show that what is claimed to be custom amounts to a definite, uniform, and known practice under certain definite

and uniform circumstances.' . . ." *Davis v. Gatewood*, supra, 299 S.W.2d at 509,[17] quoting *Shane v. Lowden*, 232 Mo. App. 360, 106 S.W.2d 956, 962 (1937).

■ There is, however, a distinction [18] between evidence introduced for the purpose of showing a common law custom in the legal, technical sense and the admissibility of certain usages of others engaged in a particular sort of business. The general principle has always been that general "custom" or "usage" of the community or of other persons who are engaged in a particular business is ordinarily admissible in evidence where it compares with the conduct of a defendant who is alleged to be negligent. Proof of existing similar usages conforming to the practices followed by a party may "properly be admitted in evidence for what it is worth." Annot., 137 A.L.R. at 611, and cases cited therein; 29 Am.Jur., Evidence, § 318 (1967); 65A C.J.S. Negligence § 232 (1966); 2 Wigmore, Evidence, § 442 (3d ed. 1940); see *Niagara Fire Insurance Co. v. Dog River Boat Service, Inc.*, 187 F.Supp. 528 (S.D.Ala.1960); *Hopper's, Inc. v. Red Bank Airport*, 15 N.J.Super. 349, 83 A.2d 457, 459 (1951).[19]

■ Evidence of general usage, while generally admissible in evidence to show what others have done, does not, however, establish the legal standard of care. In *Low v. Park Price Company*, supra, relied upon by the appellants, it is stated:

"As a general rule, the customs of the community, or of others under like circumstances, are factors to be taken into account in determining whether conduct is negligent. . . . 'In determining

---

**17.** *Davis v. Gatewood* does not control the issue here. There, the plaintiff attempted to show a "custom or practice" in order to make a submissible case by the use of "safety chains" on a trailer. Plaintiff attempted to show a "custom" to establish a standard of care and the failure of the defendant to follow it. That is not the same situation presented here.

**18.** See Annot., 137 A.L.R. 611, 613 (1942), citing *Pence v. California Min. Co.*, 27 Utah 378, 75 P. 934, 937 (1904): "Upon an issue of negligence it is not essential to the admissibility of proof of general usage to show that the usage

constituted a 'custom' in the legal technical sense; for the purpose of such evidence is simply to show the ordinary practice." Annot., 137 A.L.R. at 614; see also 29 Am.Jur., Evidence, § 318 (1967).

**19.** "The similarity that is required is, in short, a similarity in essential circumstances, or as it is usually expressed, a *substantial similarity, i. e.* a similarity in *such circumstances or conditions as might supposably affect the result in question.*" 2 Wigmore, supra, § 442 at 425. [Emphasis in original].

whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, *but are not controlling where a reasonable man would not follow them. . . .'"* *Low,* supra, 503 P.2d at 297. [Emphasis original].

As the principle has been succinctly put by Justice Holmes, "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas & P. R. Co. v. Behmeyer,* 189 U.S. 468, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903).[20]

The testimony of the usages and practices at other fixed base operations to show fire protection equipment, lightning protective devices and sprinkler systems was a factor to be taken into account by the jury along with the other substantial evidence to determine whether Cape Central failed to exercise due care, but the objective legal standard was fixed by the instruction given to the jury—"ordinary care" as defined therein. Cape Central introduced evidence of the usage at other airports, some of which had wooden hangars and none of which had sprinkler systems or lightning protection devices.[21]

Under all the circumstances, we conclude that the trial court did not err in failing to sustain the plaintiffs' post-trial motion for judgment in accordance with their motion for directed verdicts, because Cape Central introduced facts and circumstances and offered substantial evidence from which a jury could conclude that Cape Central exercised ordinary and due care.

From the evidence introduced by Cape Central, a fact question was raised as to due care and that issue was properly submitted to the jury. Hence, the trial court did not err in failing to sustain the plaintiffs' motion for judgment "notwithstanding the verdict."

## V

### Admissibility of Usage at Other Airports

■ Appellants' second point is meshed with their first. They complain of error in the trial court's failure to sustain their objections to the testimony of Cape Central's witnesses, Messrs. Seesing, Siebert and Coogan, regarding the fire-fighting facilities at other airports and fixed base operations because of "lack of foundation." The gist of appellants' contention is that no foundation was laid showing substantial similar circumstances at the other locations—there was no showing of "uniformity of circumstances and conditions" relating to providing fire-fighting equipment, lightning arresting apparatus, history of lightning strikes or history of fires at those locations. In fact, appellants argue there was a showing that many of the other locations had dissimilar structures "in that they were metal or metal-covered or masonry rather than all wood." In addition, there was no testimony regarding the proximity and availability of fire stations at the other locations.

■ But we are unwilling to conclude that the trial court erred in admitting the testimony of these witnesses. The witnesses possessed personal knowledge of the fire-fighting facilities at numerous other fixed base operations of comparable size and similar construction as Cape Central. "Usage" of what others do is relevant and admissible if the circumstances and conditions are "substantially," although not "precisely," similar. The similarity that is required is a similarity in essential, not precise, circumstances. 2 Wigmore, Evidence, supra, § 442. Whether a particular witness is qualified to give testimony rests in the sound discretion of the trial court, and such discretion will not be disturbed in the absence of abuse of discretion. *Davis v. Gate-*

20. See also cases collected in Annot., 137 A.L.R. 611, supra; Prosser, Torts, § 33, pp. 166–168 (4th ed. 1971); Restatement, Torts (Second), § 295A (1965); The T. J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932), cert. den. 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571.

21. For example, the testimony of Mr. Siebert showed that municipal airports in several cities had wooden hangars. None had lightning rods or sprinkling systems.

*wood,* supra, 299 S.W.2d at 511. We find no abuse of discretion here. Substantial similarity at other fixed base operations was shown, and we rule this point against appellants.

## VI

### *The Instructions*

Lastly, appellants contend that the trial court erred in submitting Instruction No. 6 and in refusing to give their offered Instructions A, B and C.

Appellants' contentions with reference to the instructions are, in our opinion, without merit. Cape Central did with leave amend its answer prior to trial to include that the damages were not due to its negligence. As stated, this amendment was, we believe, sufficient to raise the issue of due care on the part of Cape Central. Even if it were not, much of the evidence, except that relating to custom and usage at other airports, came in without objection, and hence the pleadings were amended to conform to the proof. Rule 55.33(b).

Neither do we believe that Instruction No. 6 gave the jury a "roving commission" or "injected a false issue" in the case. The theory of the submission to the jury as the case finally developed was that of breach of a bailment contract. Instruction No. 6 properly placed the burden of proof on Cape Central to prove that the plaintiffs' damages were not *a* [not the] direct result of the failure of Cape Central to use ordinary care. The instruction was phrased in terms of "if you believe" and properly place the burden of proof to show due care on the defendant, Cape Central. The instruction did not, as appellants contend, improperly place the burden of proof on them. Just the opposite is true.

Instruction No. 6 was not a "sole cause" instruction or an instruction in the "nature of a sole cause instruction," as that term has been used in the Missouri decisions and which is prohibited under the new Missouri Approved Instructions.

A sole cause instruction is one given on behalf of the defendant which "hypothe-sizes that the conduct of one other than defendant was the sole cause of the occurrence." MAI 1.03.

■ An instruction is not properly characterized as a "sole cause" instruction or "in the nature of a sole cause instruction" merely because it requires a verdict for the defendant in the event the jury determines that the plaintiff's losses or injuries were not a direct result of the defendant's negligence. In this respect, every defendant's verdict directing instruction implicitly infers a cause for which the defendant would not be liable notwithstanding his negligence, but it is only an instruction which expressly hypothesizes another cause which is the sole, direct or proximate cause of plaintiff's damages that would be proscribed by MAI 1.03.

■ Finally, there was no error in refusing to submit Instructions A, B and C offered by the plaintiffs. These instructions would place an absolute liability upon the bailee, Cape Central. It has always been the law that a bailee is not an insurer of the property but is responsible only for the failure to exercise ordinary care. Whether Cape Central exercised due care with respect to the airplanes and equipment must be determined with reference to all of the circumstances of the case. Under the law, the bailee is required to exercise only ordinary care, but "care" is a relative term, and the circumstances of each case must be considered. That standard of care is variable. Whether the bailee exercised due care or ordinary diligence is a question more of fact than law. In the last analysis, the question in the vast majority of cases must be left to the jury to determine. The jury did make its determination, and we find no error.

## VII

### *Conclusion*

We have studied and read the entire transcript, the depositions and all exhibits; we have read the briefs and the authorities relied upon by the parties, and we are convinced that there was no prejudicial error.

Hence, we conclude that the judgment in favor of Cape Central should be affirmed.

The judgment is affirmed.

KELLY and GUNN, JJ., concur.